1    **WO**

2

3

4

5

6

7            **IN THE UNITED STATES DISTRICT COURT**

8            **FOR THE DISTRICT OF ARIZONA**

9

10   Eldon M. Schurz,                    )   No. CV-97-580-PHX-EHC
                                         )
11                Petitioner,            )   DEATH PENALTY CASE
                                         )
12   vs.                                 )
                                         )
13                                       )   **MEMORANDUM OF DECISION**
     Dora Schriro, et al.,               )        **AND ORDER**
14                                       )
                  Respondents.           )
15                                       )
                                         )

16

17          Pending before the Court is Petitioner's Second Amended Petition, which raised

18   twenty-seven claims for habeas relief. (Dkt. 134.)[1]  In previous procedural and substantive

19   orders, this Court denied relief on all but the claims which are the subject of this Order. (Dkt.

20   29, 39, 128, 133.)  For these remaining claims, the Court concludes that Petitioner is not

     entitled to habeas relief.

21
            **FACTUAL AND PROCEDURAL BACKGROUND**
22
            On the night of December 1, 1989, Marcella Bonito, Ronald Yazzie,
23   Larry Figueroa, and an unidentified white male, were drinking beer in a
     stairwell at the back of a Phoenix motel. Defendant Eldon Schurz, Patrick
24   Allison and Julie Moore came by and asked for some beer. After they were
     refused, Schurz grabbed the beer. Bonito tried to get it back, but gave up after
25   Schurz threatened her. Schurz and his companions left and drank the beer,
     after which Schurz stated that the group at the motel must have more beer or
26   money and suggested that they go back and take it.

27   _____

28          [1]    "Dkt." refers to the documents in this Court's file.  "ROA" refers to the state
     court record on appeal (CR-90-0283-AP and CR-92-0109-PC).  "ME" refers to the minute
     entries of the state court.  "RT" refers to the court reporter's transcript.

Meanwhile, Jonathan Bahe, the victim, approached the first group. Having run out of gas, he was carrying a plastic jug of gasoline to his car. Bonito told him about the earlier robbery of their beer and complained that no one had done anything to prevent it. Bahe stated that, had he been there, he would have done something about it. Schurz, Allison and Moore returned. Schurz apparently overheard Bahe's statement and argued with him. When Schurz began pushing and punching Bahe, Bonito and Figueroa ran up the stairs to wake someone to call the police. Yazzie and the white male left.

Schurz, Bahe, and Allison remained. Moore was some distance away. Bahe was on the ground and, in an attempt to get away, crawled under a chain-link fence into a small enclosed rectangular space between a stairwell and a brick wall. Schurz picked up the plastic jug, smelled its contents, and then splashed gasoline on Bahe. Using a lighter, Schurz ignited a small puddle of gasoline. When the flames failed to spread to Bahe, he kicked the burning puddle toward him. Bahe went up in flames. After Schurz and Allison fled, Bahe managed to crawl under the fence and out of the enclosed space. Police and fire fighters arrived and extinguished the fire. Schurz later said to Moore, "He wouldn't give me the money or the beer, so I burned him."

Bahe was conscious on the way to the hospital. He was severely burned over 90 to 100 percent of his body and was moaning and shaking in pain. Much of his body was completely charred. He was unrecognizable. Even his race was unclear. The burning had caused the long muscles in his limbs to shorten so that his arms and legs were rigidly flexed and could not be straightened. He was given morphine to control the pain, but there was little else that could be done.

Bahe lived for approximately four and a half hours and, remarkably, was conscious enough to respond to questions from the police. Because of the extremely damaged state of his mouth and tongue-which were charred-his answers were nearly impossible to understand.

Approximately half an hour after the burning, Schurz and his companions were picked up by an unidentified man who wanted to buy some cocaine. Schurz claimed to know where to get some, and after exacting money from the man, directed him to a housing project where Schurz got out of the car briefly but returned without any cocaine. Schurz then said that he was robbing the man and held a lighter flame to his neck. The driver put up no resistance and Schurz, Allison, and Moore fled.

Schurz and Allison were arrested a few hours later. Both were charged with first degree murder and attempted aggravated robbery, but Allison pled guilty to the latter charge in return for testifying against Schurz.

*State v. Schurz*, 176 Ariz. 46, 50, 859 P.2d 156, 160 (1993), *cert. denied*, 510 U.S. 1026 (1993).

Petitioner was found guilty of first degree murder and attempted aggravated robbery. (ROA 109-10.)  The jury unanimously found him guilty of first degree murder on both a premeditation and a felony murder theory. (*Id*., 110.)  Following a presentence hearing, the

1   trial court found the existence of one statutory aggravating circumstance, that the murder was

2   committed in an especially cruel, heinous, or depraved manner.  (ROA 137 at 3-5.)  The trial

3   court further concluded that the mitigating circumstances were not sufficiently substantial

4   to call for leniency and sentenced Petitioner to death for the murder conviction.  (*Id*. at 8.)

5   While Petitioner's direct appeal was pending, he filed his first petition for post-

6   conviction relief ("PCR") pursuant to Rule 32 of the Arizona Rules of Criminal Procedure,

7   raising claims of ineffective assistance of counsel ("IAC") at both trial and sentencing.

8   (ROA 154.)  The PCR court considered the merits of each IAC claim but ultimately denied

9   relief.  (ROA 165.)  Petitioner petitioned the Arizona Supreme Court for review.  (ROA 170.)

10  The supreme court consolidated the PCR petition with the automatic direct appeal.  The court

11  then affirmed Petitioner's convictions and sentences and denied post-conviction relief.  *State*

12  *v. Schurz*, 176 Ariz. 46, 859 P.2d 156, *cert. denied*, 510 U.S. 1026 (1993).

13  Following the direct appeal and PCR proceedings, the Arizona Supreme Court filed

14  a second notice of post-conviction relief and appointed counsel on Petitioner's behalf.  (ROA

15  171.)  Petitioner was provided with a mitigation investigator and granted more than twelve

16  months to file a PCR petition.  (ROA 182, 188, 189 (Affidavit of Mary Durand, ¶ 1).)

17  Petitioner's second PCR petition raised additional IAC claims, as well as other claims.

18  (ROA 189.)  The PCR court took approximately nineteen months to resolve the second PCR

19  petition and denied relief.  (ROA 200.)  The Arizona Supreme Court denied a subsequent

20  petition for review.

21  Following the denial of his second PCR petition, Petitioner initiated habeas corpus

22  proceedings, filing an Amended Petition raising fourteen claims.  (Dkt. 14.)  After review of

23  the Amended Petition, this Court concluded that certain claims were procedurally barred and

24  scheduled merits briefing on the remaining properly-exhausted claims.  (Dkt. 29.)  With

25  respect to his claim of ineffective assistance of sentencing counsel, Petitioner filed his first

26  motion for an evidentiary hearing and a request to expand the state court record.  (Dkt. 76.)

27  Petitioner sought to expand the record with additional evidence that sentencing counsel

28  should have discovered and presented in mitigation.  (*Id.*)  The Court denied Petitioner's

motion without prejudice to refiling to allow him to explain how his failure to present the additional mitigation evidence in state court was not the result of lack of diligence. (Dkt. 82 at 12.)

Subsequently, the United States Supreme Court decided *Ring v. Arizona*, 536 U.S. 584 (2002), which found Arizona's death penalty sentencing scheme unconstitutional because judges, rather than juries, determined the factual existence of the statutory aggravating circumstances that rendered a defendant eligible for the death penalty. In response, Petitioner moved this Court for a stay of his habeas proceedings so that he could return to state court and pursue a successive PCR petition based on *Ring*. (Dkt. 83.) This Court stayed Petitioner's sentencing-related claims and authorized him to return to state court to commence proceedings based on *Ring*. (Dkt. 86.)

Petitioner initiated successive state PCR proceedings, but did not limit his third PCR petition to the filing of a *Ring* claim. Instead, he presented all of the claims this Court had previously found procedurally barred as well as other claims never before raised in collateral proceedings. (Dkt. 116 at 24.) The PCR court summarily dismissed the successive third PCR petition and Petitioner filed a petition for review to the Arizona Supreme Court. (*Id.* at 220, 262.) The United States Supreme Court then issued its ruling in *Schriro v. Summerlin*, 542 U.S. 348 (2004), holding that *Ring* does not apply retroactively. Thereafter, the Arizona Supreme Court denied Petitioner's petition for review. (Dkt. 116 at 300.)

Following *Summerlin*, this Court lifted its stay of Petitioner's sentencing claims.[2] (Dkt. 102.) Petitioner then filed his second request for an evidentiary hearing and expansion of the record, seeking expansion with respect to Claims 9(A)-(E) (IAC at trial) and Claims 10(A)-(B) (IAC at sentencing). (Dkt. 109.) Petitioner again requested that the record be expanded to include additional mitigation that should have been discovered and presented at sentencing. (*Id.*) Petitioner also requested a federal evidentiary hearing to present

_____

[2]     Concurrently, Petitioner moved to amend his habeas petition and lodged a second amended petition. (Dkt. 104.) This motion was denied on procedural grounds without prejudice to refiling. (Dkt. 117.)

1   testimony from trial counsel, a mitigation specialist, a psychologist, a psychiatrist, an

2   addiction specialist, and a cultural expert. (*Id.* at 3, 21-23.) Petitioner argued that he was

3   entitled to a federal evidentiary hearing because he had diligently sought to develop the

4   factual basis of his IAC claims during the litigation of his first and second PCR petitions, but

5   was curtailed by the state courts. (*Id.* at 21-23.)

6       Following an extensive review of the state court record (*see* Dkt. 128 at 6-7, 9-15),

7   the Court denied Petitioner's second request for evidentiary development, concluding that

8   he had been given ample opportunity by the state court but had failed to diligently develop

9   the factual basis of Claims 9(A)-(E), 10(A), and 10(B). (*Id.* at 7-8, 15-18.) Based on this

10  failure, the Court concluded that Petitioner was not entitled to an evidentiary hearing or an

11  expanded state court record pursuant to 28 U.S.C. § 2254(e)(2). (*Id.* at 19.)

12      While litigating his second motion for evidentiary development, Petitioner renewed

13  his motion to amend his habeas petition, seeking to re-amend claims previously found

14  procedurally barred and to add new claims never before presented to this Court.[3] (Dkt. 102,

15  120.) The Court authorized the filing of a Second Amended Petition, which re-amended and

16  added certain claims; the Court also dismissed Claims 1-3, 5, 6, 8, 10(A), 10(B), 11(B),

17  11(D) and 12-27 with prejudice and scheduled supplemental merits briefing on newly-

18  amended Claims 9(F)-(I), 10(C), 11(A) and 11(C). (*See* Dkt. 133.) In this supplemental

19  brief, Petitioner submitted his third request for discovery, expansion of the record, and an

20

21      [3]     Following submission of the Amended Petition and further procedural briefing,

22  the Court construed those pleadings to include two additional sentencing IAC claims, which
    it denominated as Claims 10(A) and 10(B). These claims contended that sentencing

23  counsel's investigation and presentation of mitigation was ineffective. (*See* Dkt. 29 at 39.)
    Claims 10(A) and 10(B) were found exhausted and were briefed on the merits. (*See* Dkts.

24  76, 79, and 80.) When Petitioner lodged his Second Amended Petition, he reformulated

25  exhausted Claims 10(A) and 10(B) and filed them together as Claim 11(A). (*See* Dkt. 134
    at 80-87.)

26      Due to the addition of Claims 10(A) and 10(B), Petitioner's Claim 10(A) was re-

27  denominated as Claim 10(C), Claim 10(B) was re-denominated as 10(D), and 10(C) was re-
    denominated as 10(E). Claims 10(C)-(E) were found procedurally barred. (*See* Dkt. 29 at

28  39-41.)

1   evidentiary hearing. (Dkt. 140.)

2                    **LEGAL STANDARD FOR FEDERAL HABEAS RELIEF**

3          Petitioner initiated this case after the effective date of the Antiterrorism and Effective

4   Death Penalty Act ("AEDPA").   Therefore, the provisions of the AEDPA govern

5   consideration of Petitioner's claims.  For properly preserved claims "adjudicated on the

6   merits" by a state court, the AEDPA established a more rigorous standard for habeas relief.

7   *See Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003) (*Miller-El I*).  As the Supreme Court has

8   explained, the AEDPA's "'highly deferential standard for evaluating state-court rulings' . .

9   . demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*,

10  537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997).

11         The phrase "adjudicated on the merits" refers to a decision resolving a party's claim

12  which is based on the substance of the claim rather than on a procedural or other non-

13  substantive ground.  *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004).  The relevant

14  state court decision is the last reasoned state decision regarding a claim.  *Barker v. Fleming*,

15  423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-804

16  (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

17         Under the AEDPA, a petitioner is not entitled to habeas relief on any claim

18  adjudicated on the merits by the state court unless that adjudication:

19         (1) resulted in a decision that was contrary to, or involved an unreasonable
           application of, clearly established Federal law, as determined by the Supreme
20         Court of the United States; or

21         (2) resulted in a decision that was based on an unreasonable determination of
           the facts in light of the evidence presented in the State court proceeding.
22
23  28 U.S.C. § 2254(d).

24         "The threshold question under AEDPA is whether [petitioner] seeks to apply a rule

25  of law that was clearly established at the time his state-court conviction became final."

26  *Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Therefore, to assess a claim under subsection

27  (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs

28  the sufficiency of the claims on habeas review.  "Clearly established" federal law consists

of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 127 S. Ct. 649 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381; *see Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004). Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark*, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir. 2004).

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. In order for a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the

1    petitioner must show that the state court's decision was not merely incorrect or erroneous,

2    but "objectively unreasonable." *Id.* at 409; *Visciotti*, 537 U.S. at 25.

3        Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state

4    court decision was based upon an unreasonable determination of the facts. *Miller-El v.*

5    *Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*).  A state court decision "based on a factual

6    determination will not be overturned on factual grounds unless objectively unreasonable in

7    light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at 340.

8    In considering a challenge under 2254(d)(2), state court factual determinations are presumed

9    to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and

10   convincing evidence."  28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240.

11       As the Ninth Circuit has noted, application of the foregoing standards presents

12   difficulties when the state court decided the merits of a claim without providing its rationale.

13   *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160,

14   1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  In those

15   circumstances, a federal court independently reviews the record to assess whether the state

16   court decision was objectively unreasonable under controlling federal law. *Himes*, 336 F.3d

17   at 853; *Pirtle*, 313 F.3d at 1167.  Although the record is reviewed independently, a federal

18   court nevertheless defers to the state court's ultimate decision.  *Pirtle*, 313 F.3d at 1167

19   (citing *Delgado*, 223 F.3d at 981-82); *see also Himes*, 336 F.3d at 853.  Only when a state

20   court did not decide the merits of a properly raised claim will the claim be reviewed *de novo*,

21   because in that circumstance "there is no state court decision on [the] issue to which to

22   accord deference."  *Pirtle*, 313 F.3d at 1167; *see also Menendez v. Terhune*, 422 F.3d 1012,

23   1025-26 (9th Cir. 2005); *Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

24                  **MERITS ANALYSIS: CLAIMS 4, 7, 9(A), 9(B), 9(C), 9(E)**

25   **Claim 4:**       **Failure to Appoint an Expert to Examine Petitioner and Assist in**
                        **his Defense Violated Petitioner's Due Process Right to Meaningful**
26                      **Psychiatric Assistance Under *Ake v. Oklahoma***

27       Petitioner contends he was deprived of his right to meaningful psychiatric assistance

28   under *Ake v. Oklahoma*, 470 U.S. 68 (1985), when the trial court failed to order a complete

1   neurological examination and failed to appoint a psychiatrist to assist with his guilt phase
2   defense.  (Dkt. 14 at 13; Dkt. 41 at 2.)[4]

3       **Background**

4       During pretrial proceedings, Petitioner moved for a mental examination to determine
5   his competency to stand trial and to investigate his mental condition at the time of the crime.[5]
6   (ROA 35.)  In that motion, defense counsel indicated, without any supporting evidence or
7   explanation, that Petitioner could not recall events during and around the time of the crimes
8   and may have been suffering from serious mental problems possibly caused and exacerbated
9   by alcohol and other drug abuse.  (*Id.*)  Subsequently, Petitioner filed a second motion
10  requesting a neurological examination to determine whether he had an organic brain disorder.
11  (ROA 37.)  Like the Rule 11 request, this motion was based on defense counsel's "belief that
12  [Petitioner] suffered from severe alcoholism, with memory loss and possible other symptoms
13  of organic brain damage."  (Dkt. 41 at 2.)  That same day, Petitioner filed a notice listing
14  possible defenses, one of which was insanity.  (ROA 38.)

15      Pursuant to Rule 11.2(c) of the Arizona Rules of Criminal Procedure, the trial court
16  ordered a pre-screening report to assist it in determining whether "reasonable grounds"
17  existed to warrant a full-scale examination of Petitioner's mental health under Rule 11.3(a).[6]

18  _____

19      [4]     In connection with Claim 4, Petitioner asks this Court to grant him discovery
20  with respect to his "background" and "the neuropsychological testing that is needed and has
    not be [sic] administered."  (Dkt. 62 at 14.)  He also requests an opportunity to "amend his
21  pleadings with this evidence" and an evidentiary hearing "at which prejudice can be shown
    through the use of necessary experts denied him at trial."  (*Id.*)  Because the Court finds that
22  no *Ake* error occurred, Petitioner's requests for evidentiary development regarding Claim 4
23  are denied.

24      [5]     At the time of his trial, Arizona's criminal rules permitted a party to request "an
    examination to determine whether a defendant is competent to stand trial, or to investigate
25  the defendant's mental condition at the time of the offense."  Ariz. R. Crim. P. 11.2 (1990).

26      [6]     Rule 11.3(a) requires the trial court to "appoint at least two mental health
27  experts, at least one of whom must be a psychiatrist, to examine the defendant and to testify
    regarding the defendant's mental condition," if the court determines that "reasonable grounds
28  for [such] an examination exist."  Ariz. R. Crim. P. 11.3(a) (1990).

1   (ME 43.)  Pursuant to this order, Dr. Jack Potts conducted an examination of Petitioner.

2   (Opening Br., Attach. A, hereinafter "Potts Rept.")[7]  In a report filed with the court, Dr. Potts

3   recommended that the court not grant Petitioner's motion for a more extensive evaluation

4   pursuant to Rule 11 because there were no grounds to question his "present competency."[8]

5   (Potts Rept. at 2.)

6       Dr. Potts described Petitioner as "alert and oriented to his name, the date, our location,

7   and his reason for seeing me."  (*Id.* at 1.)  During the examination, Petitioner's "thought

8   processes were goal-directed and intact," "he appeared to be exercising relatively good

9   judgment," and "did not appear to be suffering from any perceptual disturbances such as

10  auditory or visual hallucinations."  (*Id.*)  Petitioner denied "any previous history of

11  psychiatric hospitalizations except for a period for drug rehabilitation," as well as "any

12  family history for psychiatric problems."  (*Id.*)  Dr. Potts described Petitioner's cognitive

13  abilities as "consistent with having received his G.E.D.," and noted that he had good "insight

14  into his problems specifically with alcohol and drug abuse."  (*Id.*)

15      Dr. Potts paid specific attention to Petitioner's memory at the time surrounding the

16  alleged offense.  He stated that Petitioner's "memory appeared to be grossly intact for both

17  recent and remote events except for circumscribed periods of time usually surrounding

18  substance abuse," including "the time surrounding the alleged offense, according to

19  [Petitioner]."  (*Id.* at 1-2.)  Dr. Potts concluded that alcohol and heroin abuse "could have

20  contributed to [Petitioner] having a 'blackout' for a specific time," because "individuals who

21

22      [7]   Although Dr. Potts was an employee of Maricopa County Department of
    Health Services, he was not affiliated with the Maricopa County Attorney's Office, and his
23  office "is often consulted for unbiased evaluations."  *State v. Herrera*, 176 Ariz. 21, 31, 859
    P.2d 131, 141 (1993).
24

25      [8]   Under Rule 11.1, a person is incompetent is he or she  is "unable to understand
    the proceedings against him or her or to assist in his or her own defense""as a result of a
26  mental illness, defect or disability."  Ariz. R. Crim. P. 11.1 (1990).  A mental illness, defect
    or disability "means a psychiatric or neurological disorder that is evidenced by behavioral
27  or emotional symptoms, including congenital mental conditions, conditions resulting from
    injury or disease and developmental disabilities."  *Id.*
28

1    abuse alcohol over a period of months or years can have amnesiac episodes." (*Id.* at 2.)  Dr.

2    Potts dismissed Petitioner's alleged "memory deficits" as it impacted his final conclusion

3    regarding Petitioner's competency because they "existed prior to the alleged offense and are

4    consistent with 'blackouts' that occur during gross alcohol abuse." (*Id.*)  Thus, he described

5    the memory lapses as "more of a legal issue than a psychiatric issue." (*Id.*)

6         Dr. Potts also noted a question as to whether Petitioner was "possibly suffering from

7    an undiagnosed seizure disorder manifested by olfactory hallucinations." (*Id.*)  Dr. Potts

8    based this conclusion on Petitioner's self-report of a head trauma he purportedly suffered six

9    or seven months before his arrest and "some problems since that time." (*Id.*)  As with the

10   memory lapses, however, Dr. Potts noted that the issue of Petitioner's "recent past head

11   trauma also has nothing to do with his present competency but may have some value to be

12   pursued by the defense attorney." (*Id.*)

13        On the basis of Dr. Potts's report and the information presented in Petitioner's

14   motions, the trial court denied Petitioner's requests for psychiatric assistance. (ME 45.)  The

15   court concluded that insanity was not an issue in the case, notwithstanding the notice that it

16   was a possible defense. (*Id.*)  After reviewing the entire court record, including Dr. Potts's

17   report, the Arizona Supreme Court found the trial court's decision was not an abuse of

18   discretion because "[t]here is nothing in [Dr. Potts's] report to indicate that there was any real

19   question regarding [Petitioner's] sanity at the time of the offenses." *Schurz*, 176 Ariz. at 54,

20   859 P.2d at 164.  The supreme court noted that Petitioner's possible blackouts due to drug

21   and alcohol use could not be the basis for an insanity defense under Arizona law. (*Id.*)  At

22   the time of the crime, Arizona's insanity defense required proof that Petitioner suffered from

23   a mental disease or defect which rendered him incapable of knowing either the nature and

24   quality of the act committed or that such an act was wrong. A.R.S. § 13-502(A)(B) (1984).

25        **Clearly Established Federal Law**

26        At the time of Petitioner's conviction and sentence, *Ake v. Oklahoma* was clearly

27   established law.  Under *Ake*,

28        when a defendant demonstrates to the trial judge that his sanity at the time of

the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

470 U.S. at 83.  However, as the Ninth Circuit observed in *Gretzler v. Stewart*, 112 F.3d 992, 1001 (9th Cir. 1997), "*Ake* makes clear that psychiatric assistance is a contingent, not an absolute, right:  it holds that when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial the state must provide psychiatric assistance."  *Id.* (citing *Williams v. Calderon*, 52 F.3d 1465, 1473 (9th Cir. 1995) (citation and internal quotation omitted).

In its discussion of Claim 4 on direct appeal, the Arizona Supreme Court identified and discussed *Ake* as controlling precedent.  *Schurz*, 176 Ariz. at 53-54, 859 P.2d at 163-64. As noted above, under the "unreasonable application" prong of § 2254(d)(1), this Court must determine whether the state supreme court's application of *Ake* was not merely erroneous, but "objectively unreasonable."  *Williams*, 529 U.S. at 409.

**Discussion**

As previously summarized, based on Dr. Potts's pre-screening report, the Arizona Supreme Court concluded that Petitioner was sane at the time of the offense and competent to stand trial.  Because the report did not call into question Petitioner's sanity at the time of the offense, the supreme court concluded that *Ake* had not been violated.  *Schurz*, 176 Ariz. at 53-54, 859 P.2d at 163-64.

The supreme court's treatment of this claim is not unreasonable.  Petitioner did not meet the threshold standard required by *Ake* for the appointment of a mental health expert because he failed to demonstrate that his sanity or mental capacity at the time of the crime was likely to be a significant factor in his guilt phase defense.[9]  Dr. Potts's report does not suggest that Petitioner's sanity at the time of the offenses would likely be a significant factor at trial.  Rather, Dr. Potts found Petitioner competent to stand trial and able to assist in his

---

[9]     Consequently, Claim 9(D), alleging ineffective assistance of counsel at trial predicated on counsel's failure to pursue a mental condition defense, is also meritless.

1    defense.  Dr. Potts was made aware of Petitioner's alleged memory lapses and recent head

2    trauma, but he did not recognize either as a condition bearing on Petitioner's mental state in

3    relation to his competency or suggestive of emotional or mental disturbance indicating that

4    Petitioner's sanity at the time of the offense was likely to be a significant factor in his

5    defense.[10]  Thus, although these conditions may have constituted legitimate mitigating

6    evidence at sentencing, they did not indicate that Petitioner was incompetent at the time of

7    the crime, and thus provided no defense during the guilt phase of trial.

8         Moreover, Petitioner presented no allegations that, at the time of the crime, a mental

9    disease or defect rendered him incapable of either knowing the nature and quality of the act

10   or that it was wrong, and he presented no facts to support his general allegations of mental

11   problems, including organic brain damage.  In his pretrial motion for an examination by an

12   impartial medical expert, Petitioner's counsel merely alleged that "defendant is unable to

13   recall events during and around the time of his alleged commission of this crime," and "it

14   appears that he may have serious mental problems caused by severe alcoholism or other

15   factors." (ROA 35 at 1-2.)  Similarly, in his pretrial motion for a neurological examination,

16   Petitioner's counsel generally alleged a "belief" that Petitioner "suffers from severe

17   alcoholism, with memory loss and possible other symptoms of organic brain damage."

18   (ROA 37 at 1.)   Other than his allegation that Petitioner was insane due to intoxication or

19   organic brain damage, Petitioner cited no evidence that at the time of the commission of the

20   crimes, his behavior was erratic or that a mental disease or defect rendered him unable to

21   know the nature and quality of the act or that it was wrong.  Petitioner's bare assertions that

22   he may have had mental problems stemming from severe alcohol abuse or organic brain

23   damage were plainly insufficient to meet the threshold showing required by *Ake*.  Likewise,

24

25

26          [10]     Legally, Petitioner's alleged blackouts due to his drug and alcohol abuse
     could not be the basis of an insanity defense. *See State v. Walton*, 159 Ariz. 571, 577, 769
27   P.2d 1017, 1023 (1989) (trial court's denial of motion for mental examination after defendant
     presented evidence of childhood history of psychiatric referrals and blackouts caused by
28   substance abuse not an abuse of discretion).

even assuming Petitioner had alleged that he was insane at the time of the crimes, which he clearly did not, he failed to make a factual showing that his sanity at the time of the crimes was truly at issue.  Because Petitioner failed to make allegations or a factual showing sufficient to give the court reasonable ground to doubt his sanity at the time of the offense, he failed to meet the threshold requirement of *Ake*.  *See Caldwell v. Mississippi*, 472 U.S. 320, 324 n.1 (1985) (concluding that because "petitioner offered little more than undeveloped assertions that the requested assistance would be beneficial, [there was] no deprivation of due process").  Thus, the Arizona Supreme Court reasonably rejected the allegation in Claim 4.

In addition to an insanity defense, Petitioner claims his request for psychiatric assistance and testing could have aided him in the presentation of "viable defenses" of "intoxication and its impact on Petitioner's mind," including the issues "of whether or not he had a culpable mental state or was capable of 'reflecting' as is required for premeditation."[11]  (Dkt. 42 at 5.)  The Court disagrees.

Although there was evidence arguably suggestive of a memory lapse possibly related to Petitioner's alleged intoxication, this evidence is not sufficient to show that Petitioner's mental capacity at the time of the offense was likely to be a significant factor in his defense.  As Respondents note, Petitioner was charged with first degree murder and the mental state was alleged alternatively as "intentionally or knowingly."  (Dkt. 43 at 11.)  Thus, intent was not a necessary element of first degree murder, and the jury was therefore not permitted to consider Petitioner's intoxication as a defense.  *See Schurz*, 176 at 54-55, 859 P.2d at 164-165 (intent is not a necessary element of first degree murder where the mental state is alleged alternatively as "intentionally or knowingly").  Pursuant to Arizona statute, A.R.S. §13-503, the jury may consider a defendant's voluntary intoxication only when the mental state of "intentionally or with the intent to is a necessary element" of the offense.  *See also State v. Ramos*, 133 Ariz. 4, 6, 648 P.2d 119, 121 (1982) (evidence of intoxication allowed

---

[11]   At trial, Petitioner's defense was that his co-defendant Patrick Allison murdered the victim.

to negate the mental state of "intentionally," but not the mental state of "knowingly"). Because Petitioner was alleged to have acted knowingly in committing first degree murder, and evidence of intoxication can only be considered when intent is a necessary element of such offense, psychiatric assistance and testing would not have aided Petitioner in presenting a "viable defense" of "intoxication and its impact on [his] mind." (Dkt. 41 at 5.)

Moreover, as opposed to insanity – the mental condition at issue in *Ake* – the effect of alcohol intoxication and alcoholism are within the common knowledge and experience of the jury, and therefore no expert testimony is needed to assist the trier of fact. *See State v. Laffoon*, 125 Ariz. 484, 610 P.2d 1045 (1980). Thus, trial courts are permitted to preclude psychiatric testimony relating to the effect of alcohol upon the ability to form specific intent, even "where the intoxication is related to chronic alcoholism and there is evidence the accused may have suffered a black-out at the time of the crime." *State v. Hicks*, 133 Ariz. 64, 71, 649 P.2d 267, 274 (1982) ("trial court properly denied appellant's very general request for psychiatric proof on the issue of alcoholic black-outs as it relates to specific intent under Arizona law"); *see also State v. Herrera*, 176 Ariz. 21, 32, 859 P.2d 131, 142 (1993).

Regarding Petitioner's premeditation argument, "[t]he fact that first-degree murder requires a finding of premeditation has no bearing" on the rule that the jury may not consider intoxication as a defense in a case where the defendant is charged with intentionally or knowingly committing first degree murder. *State v. Rankovich*, 159 Ariz. 116, 125, 765 P.2d 518, 524 (1988). Under Arizona law "a defendant premeditates his crime if he either *intends or knows* that his acts will kill another human being, and his *intention or knowledge* precedes the killing by a length of time to permit reflection." *Id.* Because Petitioner was alleged to have acted knowingly or intentionally and evidence of intoxication may not be used to negate the mental state of knowingly, Petitioner has failed to show that intoxication was a significant factor at trial pursuant to *Ake*. *See State v. Lopez*, 163 Ariz. 108, 111, 786 P.2d 959, 963 (1990) (holding that because a defendant need only act knowingly in committing premeditated murder, evidence of a defendant's intoxication does not require a lesser second-degree murder instruction).

1    Petitioner also argues that his purported inability to "recall events around the time of

2   the crime, his habits and behavior [reflecting] a serious mental problem, and [the fact that]

3   he possibly suffered from organic brain damage" are relevant to the determination of his

4   "inability to form the requisite mental states of knowledge or premeditation." (Dkt. 62 at 9.)

5   The Court rejects this argument because Arizona does not allow expert testimony regarding

6   a defendant's mental disorder short of insanity as an affirmative defense or to negate the

7   *mens rea* element of a crime.  *See State v. Mott*, 187 Ariz. 536, 541, 931 P.2d 1046, 1051

8   (1997); *see also Clark v. Arizona*, 126 S. Ct. 2709 (2006) (upholding the rule established in

9   *State v. Mott*).  Indeed, Petitioner's argument that "[e]xpert testimony would have addressed

10   [his] inability to form the requisite mental states of knowledge or premeditation" (Dkt. 62 at

11   9), constitutes an argument aimed at negating the *mens rea* element of the crime.  "Courts

12   have 'referred to the use of expert psychiatric evidence to negate mens rea as a diminished

13   capacity or diminished responsibility defense.'" *Mott*, 187 Ariz. at 540, 931 P.2d at 1050.

14   The Arizona legislature has declined to adopt the defense of diminished capacity.  *Id.*[12]

15   Because any showing of diminished capacity would not have provided a viable defense to

16   the charge of first degree murder, Petitioner failed to demonstrate a reasonable probability

17   that a psychiatric expert would aid in his guilt phase defense and that the denial of expert

18   assistance would result in an unfair trial.  *See Ake*, 470 U.S. at 82 (standard requires that

19   defendant demonstrate that the desired expert assistance be a "significant factor in his

20   defense" and that with such assistance he or she will enjoy a "reasonable chance of

21   success."); *cf. Starr v. Lockhart*, 23 F.3d 1280, 1288 (8th Cir. 1994) (Starr's mental condition

22   fell within *Ake* because his mental condition was seriously in issue as it was his only viable

23   defense).

24

25    [12]    *See also Summerlin v. Stewart*, 267 F.3d 926, 947-48 (9th Cir. 2001), *rev'd on*

26   *other grounds*, 542 U.S. 348 (2004) ("Although a defense of diminished capacity may not

27   be used during the guilt phase of a murder trial to defeat a required mental state, proof of
     diminished capacity is admissible in Arizona as a mitigating circumstance for sentencing.

28   *See* A.R.S. 13-703(G)(1).").

1   Petitioner relies heavily on *Ake* (Dkt. 62 at 2-6, 12-14), but the present case is easily

2   distinguishable.   In *Ake*, the Supreme Court catalogued the numerous circumstances

3   supporting the defendant's need for expert assistance:

4          [I]t is clear that Ake's mental state at the time of the offense was a substantial
           factor in his defense, and that the trial court was on notice of that fact when the

5          request for a court-appointed psychiatrist was made.  For one, Ake's sole
           defense was that of insanity.  Second, Ake's behavior at arraignment, just four

6          months after the offense, was so bizarre as to prompt the trial judge, sua
           sponte, to have him examined for competency.   Third, a state psychiatrist

7          shortly thereafter found Ake to be incompetent to stand trial, and suggested
           that he be committed.  Fourth, when he was found to be competent six weeks

8          later, it was only on the condition that he be sedated with large doses of
           Thorazine three times a day, during trial.   Fifth, the psychiatrists who

9          examined Ake for competency described to the trial court the severity of Ake's
           mental illness less than six months after the offense in question, and suggested

10         that this mental illness might have begun many years earlier.

11  *Ake*, 470 U.S. at 86.

12         In the instant case, a psychiatric evaluation found Petitioner competent to stand trial.

13  Unlike the defendant in *Ake*, there is no indication in the record that Petitioner's behavior

14  was bizarre before, during, or after the murder.  Similarly, in contrast to *Ake*, Dr. Potts did

15  not recommend commitment, further observation, or medication after evaluating Petitioner.

16  The nature of the crime further suggests Petitioner was sane at the time of the offense.  In

17  contrast with *Ake*, nothing about the circumstances of the crime suggests that the murderer

18  was insane.  Petitioner and the victim were involved in an altercation.  As the altercation

19  progressed, the victim retreated under a fence and was left trapped between a brick wall and

20  a stairwell.  Seeing that the victim could not escape, Petitioner found some gasoline and

21  splashed the victim with it.  Petitioner then lit a puddle of gasoline on fire.  Because the

22  flames were not progressing toward the victim, Petitioner intentionally kicked the fire toward

23  the victim and he went up in flames.  Petitioner then hurriedly left the scene with Patrick

24  Allison.  (*See* RT 6/6/90 at 101-05.)

25         For all of these reasons, the Court concludes that the evidence presented by Petitioner

26  does not approach the showing found sufficient by the Supreme Court in *Ake*.  The Arizona

27  court's denial of this claim was not an unreasonable application of federal law; therefore,

28

1    relief on Claim 4 is denied.[13]

2    **Claim 7:        As Applied to the Facts of This Case, the Death Penalty Is Cruel
                      and Unusual Punishment**

3

4           Petitioner argues that the mitigating evidence presented at sentencing outweighed the

5    lone aggravating circumstance and therefore the death penalty, as imposed upon him,

6    constitutes cruel and unusual punishment in violation of the Eighth Amendment.  (Dkt. 41

7    at 13-17.)  Specifically, Petitioner claims that both the trial court and the Arizona Supreme

8    Court refused to consider and give weight to mitigation evidence in the form of his

9    "traumatic upbringing," his "intoxication on the evening of the offense," and other mitigating

     information.  (Dkt. 134 at 30-36.)[14]
10

11          The Supreme Court has established that under the Eighth and Fourteenth

12   Amendments, the sentencer in a death penalty case may not be precluded from considering

     and may not refuse to consider any constitutionally relevant mitigating evidence.  *See Lockett*
13
     *v. Ohio*, 438 U.S. 586, 604 (1978); *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982)
14
     (concluding that the state court refused to consider petitioner's mitigation evidence regarding
15

16          [13]     Petitioner's reliance on *Smith v. McCormick*, 914 F.2d 1153 (9th Cir. 1990),
17   is misplaced.  (Dkt. 41 at 3-4; Dkt. 62 at 5-6.)  In *Smith*, the Ninth Circuit considered a
     petitioner's right under *Ake* to an adversarial psychiatrist at sentencing to help establish
18   mitigating circumstances.  *Id.* at 1157.  Petitioner makes no *Ake* claim here with regard to his
     sentencing as the trial court granted Petitioner's motion for a mental health expert to help
19   establish mitigating circumstances at sentencing.  (ROA 116.)

20          [14]     In his reply brief, Petitioner raises an additional legal claim that was not
21   factually developed or presented as part of Claim 7 in his Second Amended Petition;
     Petitioner claims for the first time that the state court improperly considered Dr. Tatro's
22   report as aggravating evidence.  Because a reply brief is not the proper pleading to raise an
     additional ground for relief, this claim is not properly before the Court.  *See Cacoperdo v.*
23   *Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) (habeas claims must be raised in the petition,
24   "[t]hen the State can answer and the action can proceed").

25          Even if the Court were to consider this additional claim, it would not entitle Petitioner
26   to relief.  *See Simmons v. South Carolina*, 512 U.S. 154, 162-63 (1994) (stating that "once
     the [sentencer] finds that the defendant falls within the legislatively defined category of
27   persons eligible for the death penalty . . . the [sentencer] then is free to consider a myriad of
     factors to determine whether death is the appropriate punishment" including evidence in
28   aggravation that is not related to statutory aggravating circumstances).

his social upbringing).  However, it is for the sentencer to determine how much *weight* to accord such evidence.  *See Eddings*, 455 U.S. at 114-15.  In *Lockett* and *Eddings*, the Supreme Court did not attempt to regulate how state courts weigh submitted mitigation evidence.  The role of the habeas court is to review the record to ensure that the state court allowed and considered all relevant mitigation.  *See Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (en banc) (holding that when it is evident that all mitigating evidence was considered, trial court is not required to discuss each piece of such evidence).

The Arizona Supreme Court specifically considered Petitioner's argument that his intoxication on the day of the murder constituted a statutory mitigating circumstance.  *See Schurz*, 176 Ariz. at 56-57, 859 P.2d at 166-67.  Regarding Petitioner's intoxication as a non-statutory mitigating circumstance, this Court previously stated:

> In Arizona, sentencing courts have been instructed that if mitigation does not rise to the level of a statutory mitigating circumstance, relevant mitigation must be considered as non-statutory mitigation in order to determine whether the defendant should be treated with leniency.  *See State v. McMurtrey*, 136 Ariz. 93, 102, 664 P.2d 637, 646 (1983).  In the special verdict, in addition to finding that Petitioner experienced alcohol dependance and mixed substance abuse as non-statutory mitigating factors, the sentencing court stated that it considered these mitigating factors as well as all those listed in Petitioner's sentencing memorandum.  (ROA 137 at 8.)  Petitioner's allegations of intoxication at the time of the crime were argued to the sentencing court in his sentencing memorandum.  (*Id*.)  Thus, the sentencing record demonstrates that the sentencing court as well as the Arizona Supreme Court were able to and did consider Petitioner's intoxication evidence as non-statutory mitigation.  *See Schurz*, 176 Ariz. at 55-57, 859 P.2d at 165-67.  The Arizona Supreme Court's conclusion – that the trial court considered all proffered mitigation evidence – was not contrary to or an unreasonable application of the principles set forth in *Lockett* and *Eddings*.

Dkt. 133 at 22-23.

Nevertheless, Petitioner renews his argument here, maintaining that his intoxication evidence was not considered because Arizona requires a causal connection between intoxication evidence and the crime before it considers the information relevant.  (Dkt. 62 at 27-30.)  The Court again rejects this argument.

In conducting its independent review of a death sentence, the Arizona Supreme Court has confirmed that its consideration of mitigating information does not require the establishment of a nexus between the mitigating factor and the crime.  *See State v. Newell*,

212 Ariz. 389, 405, 132 P.3d 833, 849 (2006) ("We do not require a nexus between the mitigating factors and the crime to be established before we consider the mitigation evidence."). However, as occurred here, the failure to link the mitigating factor – in this case, Petitioner's intoxication – and the crime may be considered in assessing the quality and strength of the mitigation evidence. *Id.*

Similarly, it is clear that the state court considered evidence of Petitioner's difficult family background and other mitigating circumstances that were presented in Petitioner's sentencing memorandum. (ROA 134; *Schurz*, 176 Ariz. at 55-56, 859 P.2d at 165-66.) Therefore, the state court's consideration of the mitigation in this case was not contrary to or an unreasonable application of *Lockett* and *Eddings*. Relief on Claim 7 is denied.

### Claims 9(A)-(C) and (E): Ineffective Assistance of Counsel at Trial

Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). *See Wilson v. Henry*, 185 F.3d 986, 988 (9th Cir. 1999). To prevail on a claim of ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687. The performance inquiry asks whether counsel's assistance was reasonable considering all the circumstances. *Id.* at 688-89. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

A petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "The assessment of prejudice should proceed on the assumption that the decision-maker is reasonably, conscientiously, and impartially applying the standards that govern the decision." *Id.* at 695. If the state's case is weak, there is a greater likelihood of a reasonable probability that the outcome of the trial would have been different. *Johnson v. Baldwin*, 114 F.3d 835, 839-40 (9th Cir. 1997).

1    A court need not address both components of the inquiry, or follow any particular

2  order in assessing deficiency and prejudice.  *Strickland*, 466 U.S. at 697.  If it is easier to

3  dispose of an ineffectiveness claim on the ground of lack of prejudice, without evaluating

4  counsel's performance, then that course should be taken.  *Id.*

5    To obtain habeas relief on an ineffective assistance of counsel claim, it is not enough

6  for a petitioner to convince a federal habeas court that, in its independent judgment, the state-

7  court decision applied either prong of *Strickland* incorrectly.  Rather, the petitioner must

8  show that the state court's decision was contrary to or involved an objectively unreasonable

9  application of the *Strickland* standard law.  *See Bell v. Cone*, 535 U.S. 697, 699 (2002).

10  **Claim 9(A)**

11    Petitioner contends he was denied effective assistance of counsel during the guilt

12  phase of trial because defense counsel was unprepared and failed to obtain a continuance.

13  According to Petitioner, a continuance was necessary to enable counsel to prepare for the

14  cross-examination of Patrick Allison and to obtain a mental health expert to analyze and

15  assist with Petitioner's defense.  (Dkt. 41 at 18-21.)

16    Background

17    On February 5, 1990, the Honorable Howard Peterson set a trial date of April 4, 1990.

18  (ROA 29.)  On  March 30, the court granted Petitioner's motion to sever his trial from co-

19  defendant Allison's trial, and continued Petitioner's trial date to April 17.  (ME 47.)  On

20  April 6, the prosecution provided notice that it intended to seek the death penalty against

21  Petitioner and provided a list of witnesses for trial.  (ROA 56, 58.)  Allison was not named

22  as a potential witness.  (ROA 58.)

23    On April 17, the court granted Petitioner's motion to continue the trial date and

24  rescheduled the trial to begin May 17, on the ground that Petitioner had "not yet been granted

25  interviews with any of the State's witnesses."  (ME 65; ROA 64.)  On May 10, the trial court

26  heard oral argument on Allison's motion to dismiss or remand his severed case for a new

27  determination of probable cause (the "Motion to Dismiss"), and took the matter under

28  advisement.  (ME 70.)  On May 17, the court granted Petitioner's request to continue the trial

1   date and the trial was rescheduled to start on June 4.  (ME 71.)

2       On May 30, Petitioner filed a motion to continue the trial on the grounds that (1) the

3   court had not yet ruled on Allison's Motion to Dismiss, and "if the Court does so on June 4th

4   it may affect [Allison's] decision as to whether to testify or not, giving [Petitioner]

5   inadequate opportunity to interview him and consider and prepare necessary strategy as a

6   result of the Court's ruling," and (2) Petitioner's motion for funds to obtain transcripts of

7   taped interviews had not yet been granted and such transcripts were necessary for trial

8   preparation.  (ROA 74.)  That same day, the trial court approved Petitioner's request for

9   funds to transcribe the interviews, but did not rule on his motion to continue the trial date.

10  (ME 73.)

11      Also on May 30, the prosecution provided notice that Allison was a potential

12  prosecution witness at Petitioner's trial.  (ROA 75.)  On May 31, the prosecution filed an

13  opposition to Petitioner's motion to continue the trial date beyond June 4 on the grounds that

14  (1) the June 4 date was "agreed by the parties to be a firm date"; (2) Petitioner's counsel was

15  notified on May 30 that Allison "would enter a Change of Plea on Friday, June 1, 1990 and

16  is to be interviewed by defense counsel immediately thereafter, on the basis Allison shall

17  testify as a witness in [Petitioner's] trial on June 5, 1990"; and (3) any delay in the trial date

18  would severely prejudice the prosecution because "[d]istant witnesses have come to testify,

19  and other transient witnesses are still available, but may not be hereafter."  (ROA 77.)

20      On June 1, Allison pleaded guilty to attempted aggravated robbery in exchange for

21  dismissal of the first degree murder charge and a sentence of probation.  (ME 80; ROA 79.)

22  Pursuant to the plea agreement, Allison was required to testify "fully, accurately, truthfully,

23  [and] completely as to the acts of [Petitioner] and of the events [and] circumstances resulting

24  in the burning and death of [the victim, Jonathan] Bahe on December 2, 1989."  (ROA 79.)

25  Later that same day, defense counsel interviewed Allison.  (RT 6/6/90 at 106, 112.)

26      On Monday, June 4, the day Petitioner's trial was scheduled to begin, his case was

27  transferred from Judge Peterson to the Honorable Steven Sheldon.  (ME 85.)  "[O]ff the

28  record" and "informally," defense counsel renewed his request for a continuance.  (ROA 114

1   at 6.)  Judge Sheldon indicated his intent to summarily deny the motion beyond one day.

2   (ROA 114 at 6, 118 at 3-4.)  Petitioner then requested a change of judge, and the case was

3   reassigned from Judge Sheldon to the Honorable John Seidel.  (ME 88.)

4       On June 5, Judge Seidel heard pretrial motions and discussed the trial schedule with

5   counsel.  (ME 89.)  Defense counsel alerted Judge Seidel to the fact that he was a sole

6   practitioner and had previously anticipated that trial would be conducted only in the

7   afternoons, but he could rearrange his schedule to accommodate morning sessions as well.

8   (RT 6/5/90 at 18-22.)  Defense counsel further stated that he had presented a motion to

9   continue to Judge Sheldon, but would not need the trial date continued if opening arguments

10  and testimony could be postponed until June 6.  (*Id*. at 21-22.)  Judge Seidel agreed to

11  postpone defense counsel's opening argument to June 6.  (*Id*. at 22.)  That afternoon, before

12  counsel picked a jury, both the prosecution and defense counsel announced they were

13  "ready" for trial.  (*Id*. at 57; ME 89 at 2.)

14      The trial began on Wednesday, June 6.  (ME 93.)  After counsel for both sides

15  presented opening arguments and one witness was presented, Allison testified and was cross-

16  examined by defense counsel.  (*Id*. at 3.)

17      Following the verdict, in his motion for new trial, Petitioner argued that the failure of

18  the court to rule on the motion to continue, or to rule on it in his favor, prejudiced Petitioner

19  in presenting an adequate defense to Allison's testimony.  (ROA 114 at 6.)  Petitioner's

20  motion for new trial was summarily denied on September 19, the same day his presentence

21  hearing was held.  (RT 9/19/90 at 4.)  Neither the trial court nor the Arizona Supreme Court

22  discussed this issue in the PCR proceedings.[15]

23      Discussion

24      ─────────────────

25      [15]     In support of his first PCR petition, Petitioner submitted an affidavit asserting
    that defense counsel did not perform an adequate cross-examination of Allison and that the
26  trial should have been postponed until he was better prepared to do so.  (ROA 154 at 4.)  The
    state courts were given an opportunity but they did not address the substance of Claim 9(A);
27  therefore, this Court undertakes a *de novo* review of this claim on the merits.  *See Lewis v.*
28  *Mayle*, 391 F.3d 989, 996 (9th Cir. 2004).

1    Claim 9(A) essentially alleges a lack of pre-trial preparation.  Petitioner claims that

2  defense counsel, without tactical justification, "failed to pursue and obtain a continuance

3  [before trial] even though he knew he was not prepared and that going forward at this point

4  would prejudice his client."  (Dkt. 41 at 20.)  If his attorney had been given more time,

5  Petitioner contends, he "could have actually prepared to cross examine [sic] Patrick Allison,

6  he could have obtained and worked with a mental health expert to analyze and present

7  Petitioner's case."  (*Id*. at 21.)

8    Petitioner first claims that his counsel's inadequate preparation for trial was partly

9  caused by defense counsel's failure "to pursue and obtain a continuance."  (*Id*. at 20.)  This

10 contention is meritless because Petitioner has demonstrated neither deficient performance nor

11 prejudice.  The need for a continuance is determined by the particular facts of the case and

12 addressed to the sound discretion of the trial court.  *United States v. Manos*, 848 F.2d 1427,

13 1434 (7th Cir. 1988).  Where a motion for a continuance would prove futile, the failure to

14 seek one cannot constitute ineffective assistance.  *See United States v. Kamel*, 965 F.2d 484,

15 498 (7th Cir. 1992).

16    Defense counsel did file a motion to continue on May 30 and renewed the request in

17 the chambers of Judge Sheldon on June 4.  Had counsel made a continuance motion on June

18 6, the first day of a three-day trial, it is unlikely that the motion would have been granted.

19 Counsel had been allowed adequate time to interview Allison and review the information

20 obtained, and the trial court had already rejected his request for a mental health expert.  *See*

21 *Manos*, 848 F.2d at 1434 (stating that it is not an abuse of discretion to deny a request for a

22 continuance made on second day of trial to review evidence received the previous day).

23 Without indicating on what basis defense counsel could have sought and obtained a further

24 continuance, Petitioner cannot support his contention that trial counsel performed deficiently.

25    Moreover, even if it is assumed that counsel's failure to seek a further continuance

26 was in some way deficient, Petitioner has made no attempt whatsoever to demonstrate any

27 resulting prejudice.  *Cf. United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) (stating

28 that self-serving speculation about testimony of putative witness is not enough to show how

counsel's failure to obtain testimony was ineffective).  Petitioner has not offered the Court any specifics as to what information his counsel would have obtained if the requested continuance had been granted, *see Schone v. Purkett*, 15 F.3d 785, 789-90 (8th Cir. 1994) (to demonstrate *Strickland* prejudice, prisoner must point to arguments or evidence counsel could have discovered that would have affected decision to plead guilty), nor has he explained how this information would have aided him in better challenging Allison's testimony to the point of obtaining a verdict of not guilty, *see Iron Wing v. United States*, 34 F.3d 662, 665 (8th Cir. 1994) (even if counsel had performed as petitioner alleged counsel should have, government's case was still as strong and guilty plea was prudent course).

In addition, Petitioner fails to support his inadequate-preparation claim by identifying any information that counsel had not already gained from other witnesses that he would have gained from further interviewing Allison, further questioning his investigator, or generally taking more time to prepare for Allison's cross-examination.  *Cf. Gravenmier v. United States*, 399 F.2d 677, 678-79 (9th Cir. 1968) (counsel was not ineffective in failing to make personal contact with witnesses or investigate the case where "there is no proof in the record . . . that any alibi witnesses existed").  Furthermore, the Court cannot question counsel's decision not to interview Allison until June 1 because that was the first opportunity he had to do so.  Moreover, there is no evidence that further investigation of Allison, or additional preparation for cross-examination, would have revealed information that did not otherwise come to light.  *See Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001) ("A claim of failure to interview a witness cannot establish ineffective assistance when the person's account is otherwise fairly known to defense counsel.").  Petitioner does nothing more than speculate that if counsel had conducted further interviews or been allowed more time to prepare, he might have provided a better cross-examination of Allison or a better defense based on the advice or testimony of a mental health expert.

On this record, the Court concludes that Petitioner has not made a sufficient showing of counsel's omissions to demonstrate that counsel rendered deficient performance in preparation for trial.  *See id*. (stating that when the record shows that the lawyer is well

1    informed and petitioner does not state what additional information should have been gained,

2    an ineffective assistance claim fails).  In addition, based upon its review of the record, the

3    Court finds there is not a reasonable probability that Petitioner would not have been found

4    guilty had his counsel been given more time to prepare for trial by obtaining a continuance.

5    *See Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985).  Thus, Petitioner is not entitled to relief on

6    Claim 9(A).  Similarly, this Court has already rejected Petitioner's conclusory allegation that

7    defense counsel could have obtained a mental health expert to analyze and present a guilt

8    phase defense.  *See supra* note 9.

9         **Claim 9(B)**

10        Petitioner contends that "he wanted to testify at trial but did not on the advice of his

11   counsel."  (Dkt. 41 at 21.)  Petitioner argues that such advice constituted ineffective

12   assistance of counsel.  (*Id.*)  Other than Allison's testimony, Petitioner claims that the State

13   had no evidence that he, rather than Allison, set the victim on fire.  (*Id.*)  Therefore,

14   according to Petitioner, it was imperative for him to testify in his own defense.  (*Id.*)

15        Background

16        Petitioner did not testify at trial.  In his first PCR Petition, Petitioner argued that he

17   received ineffective assistance of counsel because his attorney prevented him from testifying

18   by telling him that it would hurt his defense.  He further alleged that his attorney "misledd

19   [sic] [him] by getting [him] to agree not to testify."  (ROA 154 at 4.)

20        During trial, at the close of the prosecution's case-in-chief, the following colloquy

21   occurred outside the jury's presence:

22        MR. SUSEE: Your Honor, the defense does not intend to call any
          witnesses.
23

24        THE COURT: Have you discussed it with your – well, since the jury
          isn't here, I'm going to, just so the record is clear, I want to satisfy myself that
          you have discussed with Mr. Schurz his rights, both his right not to testify and
25        his right to testify.

26        MR. SUSEE: Your Honor, on several occasions Mr. Schurz and I have
          had conversations regarding whether he should testify or not.  It is his
27        conclusion – I assured him that it was his absolute right to testify, if he so
          chooses.  At this time his statement to me is he does not choose to testify.

28

1      THE COURT: And I assume that you told him that it's his decision, although you can give him your thoughts and advice, if you will, what you say is not binding on him and –

2

3      MR. SUSEE: Yes, Your Honor.

4      THE COURT:  – it's his decision whether or not to testify?

5      MR. SUSEE: Yes, I have, Your Honor.  I emphasized that that is one of the most important decisions that he does have to make and that it is his decision, not mine, as to whether he testifies or not.

6

7      THE COURT: Do you dispute anything that was said on this point, Mr. Schurz?

8

9      THE DEFENDANT: No.

10     THE COURT: All right.  And I take it, then, you have no other evidence that you wish to present or offer?

11     MR. SUSEE: Not at this time, Your Honor.

12     THE COURT: Your client indicates – you might want to talk to him. Go ahead.

13

14     MR. SUSEE: Excuse me.

15     (Discussion held off the record)

16     MR. SUSEE: Excuse me, Your Honor, would it be possible to confer with my client for say five minutes outside?

17     THE COURT: Yes, why don't you.  We'll take a recess and you and Mr. Schurz can confer.  And then what I'll ask you to do is to come into my office with Mr. Levy and let me know whether you're going to proceed with further evidence, because if you tell me you're not, then my plan would be to bring the jury out, to admonish them and send them home and come back first thing in the morning for closing arguments, and we'll use the rest of the afternoon to do instructions.

18

19

20     On the other hand, if you wish to present evidence, then we'll proceed with that.

21

22     MR. SUSEE: All right.

23     THE COURT: Okay?

24     MR. SUSEE: Thank you.

25     THE COURT: We'll be in recess.

26     (Recess taken)

27     THE COURT: Thank you.  The record may show the presence of the jury, counsel, the Defendant.

28     Mr. Susee.

- 27 -

MR. SUSEE: Yes, Your Honor.  The Defendant has no witnesses he wishes to present at this time.

THE COURT: Defense rests?

MR. SUSEE: That is correct.

(RT 6/7/90 at 113-15.)  The court never questioned Petitioner further about testifying, and Petitioner did not ask to testify or object to his counsel's statements.

In ruling on this claim at the PCR stage, the trial court noted that it had made a specific inquiry on the record "to determine whether defense counsel and [Petitioner] had conferred with regard to the [Petitioner's] right to testify or not testify and with regard to the proposition that the decision was that of [Petitioner]." (ROA 165 at 7.)  The trial court found that the advice given by defense counsel not to testify "constituted <u>effective</u> assistance of counsel under the circumstances," because Petitioner was subject to impeachment in several respects.[16]  (*Id*.)

Similarly, the Arizona Supreme Court determined that Petitioner failed to state a colorable claim of ineffective assistance of counsel:

> By failing to explain the way in which counsel's advice was defective, Schurz fails to overcome the presumption that it was sound.  Schurz does not allege that he was unaware of his right to testify, nor that counsel deprived him of this right.  It appears merely that he now regrets his decision.  In addition, it is difficult to imagine how his testimony could have changed the outcome of the trial given that defense counsel thoroughly argued his theory that Allison rather than Schurz was the murderer.

*Schurz*, 176 Ariz. at 58, 859 P.2d at 168.

Discussion

Petitioner does not claim that he was unaware of his right to testify; he claims only that his attorney persuaded him not to testify by telling him that his decision to take the stand and testify would hurt the defense.  Petitioner fails to state what defense counsel said or did other than provide his opinion on the subject that "misled" Petitioner into deciding not to

---

[16]     Petitioner had prior felony convictions for robbery and assault, which, the trial court ruled, would have been admissible to impeach him if he had testified. (RT 6/5/90 at 27-32; ME 89.)

1    testify; presumably, Petitioner has concluded that counsel's advice was misleading or
2    unsatisfactory because the jury ultimately found him guilty.

3         In evaluating an ineffective assistance claim, a reviewing court does not grade trial
4    counsel's performance; it examines only whether his conduct was reasonable under
5    prevailing professional norms and in light of the circumstances of the case. *Strickland*, 466
6    U.S. at 688, 697.  Because it may be tempting to find an unsuccessful trial strategy to be
7    unreasonable, "a court must indulge a strong presumption that counsel's conduct falls within
8    the wide range of reasonable professional assistance; that is, the defendant must overcome
9    the presumption that, under the circumstances, the challenged action might be considered
10   sound trial strategy." *Id.* at 689.

11        Here, trial counsel advised Petitioner not to testify.  The advice provided by a criminal
12   defense lawyer on whether his client should testify is a paradigm of the type of tactical
13   decision that cannot be challenged as evidence of ineffective assistance. *See Hutchins v.*
14   *Garrison*, 724 F.2d 1425, 1436 (4th Cir. 1983); *see also Dows v. Wood*, 211 F.3d 480, 487
15   (9th Cir. 2000) (trial counsel properly advised defendant not to testify due to significant
16   impeachment from prior felony convictions).  Petitioner took trial counsel's advice and did
17   not testify.  His current disagreement with counsel's advice does not entitle him to habeas
18   relief based on ineffective assistance. *See Guam v. Santos*, 741 F.2d 1167, 1169 (9th Cir.
19   1984) (a tactical decision of counsel cannot form the basis for a claim of ineffective
20   assistance of counsel).

21        Petitioner has not shown that trial counsel's actions fell outside the wide range of
22   professional competence.  The state courts' denial of this claim was not an unreasonable
23   application of *Strickland*.  Therefore, habeas relief for Claim 9(B) is denied.

24   **Claim 9(C)**

25        Petitioner contends that trial counsel's cross-examination of co-defendant Allison was
26   ineffective and prejudiced him at the guilt phase of his trial.  As noted above, in undertaking
27   habeas review of an IAC claim, this Court is highly deferential to strategic trial decisions,
28   including the scope and manner of cross-examination of witnesses. *See Dows*, 211 F.3d at

1   487.

2        Background

3        In an affidavit attached to his first PCR petition, Petitioner alleged that trial counsel

4   "did not prepare very well for the cross-examination of co-defendant Patrick Allison" and

5   that his performance was therefore inadequate. (ROA 154.) Subsequently, counsel filed a

6   supplemental PCR. (ROA 161.) In the supplemental PCR petition, counsel neither alleged

7   any additional facts nor presented any additional argument regarding Claim 9(C). (*Id.*)

8        The PCR court analyzed the claim as presenting an allegation of ineffective assistance

9   of counsel. (ME 2/14/92.) The PCR court recalled that defense counsel had interviewed

10  Allison prior to the beginning of trial. (*Id.*) In evaluating Petitioner's claim, the court

11  pointed out that Petitioner had not presented any specific allegations regarding alleged

12  deficiencies in the cross-examination of Allison, such as "what questions should have been

13  asked which were not asked." (*Id.*) In the absence of any specific allegations of deficient

14  performance or prejudice, the PCR court denied relief. (*Id.*)

15       Petitioner filed a petition for review, and the Arizona Supreme Court resolved Claim

16  9(C) in much the same manner as the PCR court. Utilizing the standard from *Strickland*, the

17  court stated:

18           With this standard in mind, it is clear that Schurz has failed to state a colorable
             claim based on counsel's . . . allegedly inadequate cross-examination of
19           Allison. . . . [H]e fails to explain the way in which counsel's preparation for
             cross-examination of Allison was inadequate, what questions should have been
20           asked, or how they would have affected the outcome of the trial.

21  *Schurz*, 176 Ariz. at 58, 859 P.2d at 168.

22       Discussion

23       Despite not raising any of the following assertions in state court, Petitioner contends

24  that counsel failed to adequately impeach Allison regarding his favorable plea agreement,

25  his prior felony conviction, and inconsistent statements made to Detective Saldate during the

26  investigation. (Dkt. 41 at 21-31.) Respondents do not object to the tardiness of the

27  arguments. (Dkt. 43 at 33.) Because the allegations were never presented to or considered

28  by the state court, this Court's review is *de novo*. *See Lewis*, 391 F.3d at 996.

*Plea Agreement*

Petitioner argues that trial counsel failed to fully explore the benefits that Allison received under his plea agreement and, as a result, the jury did not have a full appreciation of how much the plea agreement influenced Allison's testimony against him. (*Id.* at 22-25.) Petitioner argues that the plea agreement resulted in Allison avoiding almost thirty years of prison, a fact that counsel should have used to impeach Allison's testimony more thoroughly. (*Id.*)

The Court concludes that counsel did an adequate job of emphasizing to the jury the importance of the plea agreement and how such an agreement could have affected Allison's testimony. For example, during his opening argument, counsel informed the jury:

> The only person of such substance that you will hear from who does have every reason in the world to give you a different story – and we'll hear that, as you have heard from the County Attorney, that [Allison] has signed a plea agreement that virtually turns him free in exchange for testifying against Eldon Schurz.

(RT 6/6/90 at 37.)  During cross-examination, counsel had Allison admit that he was testifying pursuant to a plea agreement through which he had avoided a considerable prison sentence. (*Id.* 6/6/90 at 119-20.)  Further, counsel argued during his closing:

> You don't have to be a genius to figure out that if there are two people charged with a crime, that only the two of them witnessed, that each of them is going to say the other one did it. Each of them is going to be – especially in a case where the stakes are this high – willing to say for the – in exchange for a promise that they go free, whatever it takes.

(RT 6/8/90 at 30.)  Referring to the favorable terms that Allison received under the plea agreement, counsel argued that the State had "purchased the cooperation, the testimony of Patrick Allison." (*Id.*)

Under *Strickland*, the standard for effective performance is not perfect advocacy. *See Dows*, 211 F.3d at 487.  This is particularly true when evaluating tactical decisions such as those involved in the questioning of witnesses. *Id.*  Thus, under *Strickland*, counsel's cross-examination of witnesses must be only objectively reasonable, not flawless or to the highest degree of skill. *Id.*  Applying this standard, trial counsel's performance, while not stellar, was not constitutionally deficient.  He used Allison's favorable plea agreement to challenge

1    the witness's credibility before the jury.

2        *Prior Felony Conviction*

3        Next, Petitioner contends that trial counsel did not do an adequate job of impeaching

4    Allison on the basis of his prior felony conviction. (Dkt. 41 at 25-28.) Petitioner contends

5    that counsel's cross-examination left Allison basically unimpeached and that there was no

6    tactical reason for this failure. (*Id.*)

7        The fact that Allison had a previous felony conviction was presented to the jury. Trial

8    counsel first alerted the jury to this fact during his opening statement:

9        Now, I don't have to tell you that when there are only two persons watching
         something, only two persons present, who knows [sic?] what actually
10       happened.  We have a real problem determining who says what and what
         happened, because we only have their word.  So you have to look closely at
11       how reliable is Patrick Allison?  Can we – and, in fact, what you're going to
         see will help tell you whether we can depend on him to give us the truth in this
12       matter or not.  You will hear that Patrick has previously been convicted of a
         felony offense.
13
14   (RT 6/6/90 at 38.) Under cross-examination by defense counsel, Allison admitted that he had

15   a felony conviction on his record. (*Id.* at 130-31.)

16       While counsel could have done a more thorough job impeaching Allison on the basis

17   of his prior felony conviction, counsel did establish the fact before the jury and thus the jury

18   could use the information is assessing the witness's credibility.  Counsel's decision to not

19   require Allison to specify the nature of his prior felony conviction, which was a minor felony

20   for possession of a vapor releasing toxic substance, was strategic and thus is accorded great

21   deference. *See Dows*, 211 F.3d at 487; *Gustave v. United States*, 627 F.2d 901, 904 (9th Cir.

22   1980) (mere criticism of a tactic or strategy is not in itself sufficient to support a charge of

23   inadequate representation).  Again, as to this aspect of the claim, counsel's performance,

24   while not stellar, was not ineffective; he placed Allison's credibility at issue before the jury

25   based on the prior felony conviction.

26       *Inconsistent Statements to Detective Saldate*

27       Finally, Petitioner contends that counsel ineffectively cross-examined Allison

28   regarding inconsistencies in his statements to Detective Saldate during the homicide

1    investigation.   (Dkt. 41 at 28-31.)   He also faults counsel for not raising Allison's

2    inconsistent story during counsel's cross-examination of Detective Saldate.  (*Id.*)

3           During cross-examination, counsel impeached Allison by having him admit that the

4    original story he told to Detective Saldate was not true.  (RT 6/6/90 at 117.)  Even though the

5    impeachment was not extensive, counsel did raise Allison's inconsistent statements to

6    Detective Saldate before the jury.  Counsel's performance was not ineffective; he placed

7    Allison's credibility at issue before the jury based on his inconsistent statements to the

8    detective.

9           Conclusion

10          Counsel's cross-examination of Allison was not objectively unreasonable.  He placed

11   Allison's credibility squarely before the jury for its consideration.  Absent a showing of

12   deficient performance, there is no need to consider prejudice. *See Strickland*, 466 U.S. at

13   687.  Habeas relief on Claim 9(C) is denied.

14          **Claim 9(E)**

15          Petitioner contends that trial counsel conducted an ineffective trial investigation

16   because he failed to locate a missing "white male" who had been at the murder scene, failed

17   to call any witnesses to testify on his behalf at trial, failed to produce additional evidence of

18   Petitioner's intoxication at the time of the homicide, and failed to produce forensic evidence

19   that Allison committed the murder.  (Dkt. 41 at 31-32.)  Petitioner presented only the first of

20   these claims to the state court.  (ROA 154.)  Thus, this allegation is reviewed pursuant to 28

21   U.S.C. § 2254(d)(1).  The rest of the allegations are reviewed *de novo*.  *Lewis*, 391 F.3d at

22   996.

23          Background

24          In an affidavit attached to his first PCR petition, Petitioner alleged that trial counsel

25   "did not look very hard for the one person who was very important to my case.  And that was

26   the white male that I had a confrontation with the night of the murder.  I feel that if he had

27   testified at my trial, the verdict would have been different."  (ROA 154.)  Counsel filed a

28   supplemental PCR petition, but the supplemental PCR neither alleged any additional facts

1    nor presented any additional argument regarding Claim 9(E).  (ROA 161.)

2         The PCR court analyzed the claim as presenting an allegation of ineffective assistance

3    of counsel and resolved the claim as follows:

> The Court notes that Petitioner does not state or even suggest what defense
> counsel should have done to try to find this person.  The evidence presented
> at trial showed that most, if not all, of the people who were present when the
> murder occurred, were transients.  It is therefore questionable, if not
> improbable, that this witness could have been located to appear at trial.  Even
> if he had, there is nothing in the Petition which states or even suggests what he
> would have said.  Without this it would be impossible to conclude that this
> witness testimony would show a reasonable probability that if the witness had
> testified, a different result would have occurred.

9    (ROA 165.)  Petitioner filed a petition for review, but the Arizona Supreme Court resolved

10   the allegations in Claim 9(E) in much the same manner as the PCR court.  Utilizing the

11   standard from *Strickland*, the court stated:

> With this standard in mind, it is clear that Schurz has failed to state a
> colorable claim based on counsel's failure to locate the unidentified white male
> . . . Defendant does not state what the white male's testimony might have been
> or how it would have affected the trial, but merely argues that had this witness
> been found, the verdict would have been different.

15   *Schurz*, 176 Ariz. at 58, 859 P.2d at 168.

16        Discussion

17        Petitioner failed to allege the manner in which counsel's performance was deficient

18   with respect to his investigation of the alleged white male supposedly at the scene of the

19   attempted robbery.  However, even if counsel's investigation was deficient, Petitioner failed

20   to allege how the deficient investigation prejudiced him at trial.  Therefore, the state court's

21   conclusion denying relief regarding this allegation did not involve an unreasonable

22   application of *Strickland*.

23        Regarding the other deficient performance allegations of Claim 9(E), Petitioner's

24   allegations of prejudice are purely speculative.  He has not attempted to meet his burden with

25   respect to prejudice by offering specific allegations regarding uncalled witnesses, additional

26   evidence of intoxication, and other forensic evidence.  *See, e.g.*, *United States v. Berry*, 814

27   F.2d 1406, 1409 (9th Cir. 1987) (stating that mere speculation about the possible testimony

28   of uncalled witnesses does not establish the prejudice prong of an ineffective assistance

1   claim).  Therefore, Claim 9(E) is meritless.

2   <u>**LEGAL STANDARDS FOR EVIDENTIARY DEVELOPMENT**</u>

3   As discussed more fully below, Petitioner requests evidentiary development of newly-

4   amended Claims 9(F)-(I), 10(C), 11(A), and 11(C).[17]  The Court first sets forth the pertinent

5   legal standards before addressing the merits and evidentiary requests as to these claims.

6   <u>**Discovery**</u>

7   Rule 6(a) of the Rules Governing Section 2254 Cases provides that "[a] judge may,

8   for *good cause*, authorize a party to conduct discovery under the Federal Rules of Civil

9   Procedure, and may limit the extent of discovery."  Rule 6(a), Rules Governing § 2254

10  Cases, 28 U.S.C. foll. § 2254 (emphasis added).  Thus, unlike the usual civil litigant in

11  federal court, a habeas petitioner is not entitled to discovery "as a matter of ordinary course,"

12  *Bracy v. Gramley*, 520 U.S. 899, 904 (1997); *see Campbell v. Blodgett*, 982 F.2d 1356, 1358

13  (1993), nor should courts allow him to "use federal discovery for fishing expeditions to

14  investigate mere speculation," *Calderon v. United States Dist. Ct. for the N. Dist. of Cal.*

15  *(Nicolaus)*, 98 F.3d 1102, 1106 (9th Cir. 1996); *see also Rich v. Calderon*, 187 F.3d 1064,

16  1067 (9th Cir. 1999) (habeas corpus is not intended to be used as a fishing expedition for

17  petitioners to "explore their case in search of its existence") (quoting *Aubut v. State of Maine*,

18  431 F.2d 688, 689 (1st Cir. 1970)).  To determine whether a petitioner has established "good

19  cause" for discovery under Rule 6(a), a habeas court must identify the essential elements of

20  the petitioner's substantive claim and evaluate whether "specific allegations before the court

21  show reason to believe that the petitioner may, if the facts are fully developed, be able to

22  demonstrate that he is . . . entitled to relief."  *Bracy*, 520 U.S. at 908-09 (quoting *Harris v.*

23  *Nelson*, 394 U.S. 286, 300 (1969)).

24  <u>**Evidentiary Hearing**</u>

25  _____

26         [17]     The Court denied Petitioner's requests for evidentiary development of Claims

27  9(A)-(E), 10(A), and 10(B) in an order filed September 30, 2005. (Dkt. 128.) As previously
    discussed in *supra* note 3, Petitioner later combined and redominiated Claims 10(A) and

28  10(B), as Claim 11(A).

Historically, the district court had considerable discretion to hold an evidentiary hearing to resolve disputed issues of material fact. *See Townsend v. Sain*, 372 U.S. 293, 312, 318 (1963), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *and limited by* § 2254(e)(2); *Baja v. Ducharme*, 187 F.3d 1075, 1077-78 (9th Cir. 1999); Rule 8, Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (district court judge shall determine if an evidentiary hearing is required). That discretion is significantly circumscribed by § 2254(e)(2) of the AEDPA. *See Baja*, 187 F.3d at 1077-78.

Section 2254 provides that:

> *If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –*
>
> (A) the claim relies on –
>
> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2) (emphasis added). The Supreme Court has interpreted subsection (e)(2) as precluding an evidentiary hearing in federal court if the failure to develop a claim's factual basis is due to a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). A hearing is not barred, however, when a petitioner diligently attempts to develop the factual basis of a claim in state court and is "thwarted, for example, by the conduct of another or by happenstance was denied the opportunity to do so." *Id.*; *see Baja*, 187 F.3d at 1078-79 (allowing hearing when state court denied opportunity to develop factual basis of claim).

When the factual basis for a particular claim has not been fully developed in state court, the district court must first determine whether the petitioner was diligent in attempting to develop the factual record. *See Baja*, 187 F.3d at 1078 (quoting *Cardwell v. Greene*, 152

F.3d 331, 337 (4th Cir. 1998)).  The diligence assessment is an objective one, requiring a determination of whether a petitioner "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Williams*, 529 U.S. at 435.  For example, when there is information in the record that would alert a reasonable attorney to the existence and importance of certain evidence, the attorney fails to develop the factual record if he does not make reasonable efforts to sufficiently investigate and present the evidence to the state court.  *See id*. at 438-39, 442; *Alley v. Bell*, 307 F.3d 380, 390-91 (6th Cir. 2002) (lack of diligence because petitioner knew of and raised the claims in state court, but failed to investigate all the factual grounds for such claims).

Absent unusual circumstances, diligence requires that a petitioner "at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Williams*, 529 U.S. at 437; *see Bragg v. Galaza*, 242 F.3d 1082, 1090 (9th Cir.) (finding no diligence because petitioner neither requested an evidentiary hearing in the trial court nor filed a state habeas petition), *amended on denial of reh'g*, 253 F.3d 1150 (9th Cir. 2001).  The mere request for an evidentiary hearing, however, may not be sufficient to establish diligence if a reasonable person would have taken additional steps.  *See Dowthitt v. Johnson*, 230 F.3d 733, 758 (5th Cir. 2000) (failed to present affidavits of family members that were easily obtained without court order and with minimal expense); *see also McNair v. Campbell*, 416 F.3d 1291, 1299-1300 (11th Cir. 2005) (no development of evidence available through petitioner, family members, and medical literature, and no appeal of denial of funds and hearing); *Cannon v. Mullin*, 383 F.3d 491, 500 (5th Cir. 2004) (lack of diligence if petitioner does not proffer "evidence that would be readily available if the claim were true."); *Koste v. Dormire*, 345 F.3d 974, 985-86 (8th Cir. 2003) (no effort to develop the record or assert any facts to support claim).

In sum, if this Court determines that a petitioner has not been diligent in establishing the factual basis for his claims in state court, then the Court may not conduct a hearing unless the petitioner satisfies one of § 2254(e)(2)'s narrow exceptions.  If, however, the petitioner has not failed to develop the factual basis of a claim in state court, the Court will then

proceed to consider whether a hearing is appropriate or required under the criteria set forth by the Supreme Court in *Townsend*.  372 U.S. 293; *see Baja*, 187 F.3d at 1078 (quoting *Cardwell*, 152 F.3d at 337); *Horton v. Mayle*, 408 F.3d 570, 582 n.6 (9th Cir. 2005).

Pursuant to *Townsend*, a federal district court *must* hold an evidentiary hearing in a § 2254 case when:  (1) the facts are in dispute; (2) the petitioner "alleges facts which, if proved, would entitle him to relief;" and (3) the state court has not "reliably found the relevant facts" after a "full and fair evidentiary hearing," at trial or in a collateral proceeding. *Townsend*, 372 U.S. at 312-13; *cf. Hill v. Lockhart*, 474 U.S. 52, 60 (1985) (upholding the denial of a hearing when petitioner's allegations were insufficient to satisfy the governing legal standard); *Bashor v. Risley*, 730 F.2d 1228 (9th Cir. 1984) (hearing not required when claim must be resolved on state court record or claim is based on non-specific conclusory allegations).  In addition, the Court established six circumstances under which there is presumptively no "full and fair hearing" at the state level:

> (1) the merits of the factual dispute were not resolved in the state hearing;
>
> (2) the state factual determination is not fairly supported by the record as a whole;
>
> (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing;
>
> (4) there is a substantial allegation of newly discovered evidence;
>
> (5) the material facts were not adequately developed at the state-court hearing; or
>
> (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Townsend*, 372 U.S. at 313.  In any other case in which diligence has been established, the district court judge "has the power, constrained only by his sound discretion, to receive evidence bearing upon the applicant's constitutional claim."  *Id*. at 318 (noting that if a "habeas applicant was afforded a full and fair hearing by the state court resulting in reliable findings, [the judge] may, and ordinarily should, accept the facts as found in the hearing.").

**Expansion of the Record**

1    Rule 7 of the Rules Governing Section 2254 Cases authorizes a federal habeas court

2   to expand the record to include additional material relevant to the petition.  Rule 7 provides:

3   "The materials that may be required include letters predating the filing of the petition,

4   documents, exhibits, and answers under oath, to written interrogatories propounded by the

5   judge.  Affidavits may also be submitted and considered as part of the record."  Rule 7(b),

6   Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.  The purpose of Rule 7 "is to enable

7   the judge to dispose of some habeas petitions not dismissed on the pleadings, without the

8   time and expense required for an evidentiary hearing."  Advisory Committee Notes, Rule 7,

9   28 U.S.C. foll. § 2254; *see also Blackledge v. Allison*, 431 U.S. 63, 81-82 (1977).  Any time

10  expansion of the record is sought, the Court must assess whether the materials submitted are

11  relevant to resolution of the petition.

12    Section 2254(e)(2), as amended by the AEDPA, limits a petitioner's ability to present

13  new evidence through a Rule 7 motion to expand the record to the same extent that it limits

14  the availability of an evidentiary hearing.  *See Cooper-Smith v. Palmateer*, 397 F.3d 1236,

15  1241 (9th Cir. 2005) (applying § 2254(e)(2) to expansion of the record when intent is to

16  bolster the merits of a claim with new evidence) (citing *Holland v. Jackson*, 542 U.S. 649,

17  652-53 (2004) (per curiam)).  Thus, when a petitioner seeks to introduce new affidavits and

18  other documents never presented in state court, for the purpose of establishing the factual

19  predicate of a claim, he must either demonstrate diligence in developing the factual basis in

20  state court or satisfy the requirements of § 2254(e)(2)(A) & (B).  However, when a petitioner

21  seeks to expand the record for other reasons, such as to cure omissions in the state court

22  record, *see Dobbs v. Zant*, 506 U.S. 357, 359 (1993) (per curiam), establish cause and

23  prejudice, or demonstrate diligence, the strictures of § 2254(e)(2) do not apply.  *See Boyko

24  v. Parke*, 259 F.3d 781, 790 (7th Cir. 2001).

25  **MERITS ANALYSIS: CLAIMS 9(F), 9(G), 9(H), 9(I), 10(C), 11(A), and 11(C)**

26  **Claims 9(F)-(I): Ineffective Assistance of Counsel at Trial**

27    In support of these trial IAC claims, Petitioner seeks an evidentiary hearing to present

28  testimony from trial counsel, co-defendant Allison, a *Strickland* expert, a forensic expert, a

criminologist, and a police practices expert as well as broad discovery from the Maricopa County Office of Court Appointed Counsel, the prosecutor, the Sheriff's office, and others. (Dkt. 140 at 27-30, 34-36, 44-48, 51-53.) He also seeks to expand the record with various documents such as counsel's billing records.  (*Id.* at 94-97.)  However, as discussed next, Petitioner's lack of diligence in developing the facts in state court bars him from further development of these claims in this Court.

### Diligence in State Court

Petitioner contends that in litigating his successive third PCR petition he diligently attempted to develop Claims 9(F)-(I) but the state court curtailed his efforts by denying investigative and expert funding and by failing to grant his request for an evidentiary hearing. (Dkt. 140 at 81-90; Dkt. 153.)  Because he was curtailed in state court, Petitioner maintains that he is entitled to factually develop this and other claims on habeas review.  (*Id.*)

As previously indicated, under § 2254(e)(2), a federal court is precluded from holding an evidentiary hearing or expanding the record if the failure to develop a claim's factual basis in state court is due to a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."  *Taylor*, 529 U.S. at 432.  The federal court's evaluation of diligence depends upon "whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Id.* at 435.

*Summary of Arizona's Successive PCR Rules*

A petitioner seeking post-conviction relief in state court has the obligation to bring any and all known claims in his initial PCR petition.  Ariz. R. Crim. P. 32.4(a) & (c)(1) (2003). Arizona restricts the filing of a successive petition to certain exceptional claims. *See* Ariz. R. Crim. P. 32.2(b).  These exceptions to preclusion include claims based on newly discovered evidence, a significant change in the law, and actual innocence of the crime or of the death penalty.  To commence a successive PCR proceeding, a petitioner files a successive notice of post-conviction relief in the PCR court.  In the successive notice, the petitioner indicates the type of exceptional claim being raised and the meritorious reasons entitling the claim to go forward for preparation of a petition.  If a petitioner's notice does

1    not meet these requirements, the PCR court is required to summarily dismiss the notice,

2    without preparation of a petition.  Ariz. R. Crim. P. 32.2(b); *see State v. Rosales*, 205 Ariz.

3    86, 90, 66 P.3d 1263, 1267 (App. 2003) (If "a trial court is presented with a successive notice

4    of post-conviction relief in which no claims under Rule 32.1(d) through (h) are articulated,

5    supported by facts, and excused for being tardily raised, the court could dismiss the entire

6    proceeding on the notice, implicitly finding that all potential claims are precluded by being

7    waived in the previous proceeding.  Such a ruling would necessarily include potential claims

8    under Rule 32.1(a) through (c), for which no exception to the preclusion or timeliness rules

9    exists.").

10        Once a *prima facie* successive claim has been presented and not summarily dismissed

11   at the notice stage, the claim is to be presented in a successive PCR petition, along with

12   affidavits, records, and other evidence supporting the claim.  Ariz. R. Crim. P. 32.5.

13   Following briefing, the PCR court is required to review the petition and then identify and

14   dismiss any and all claims that are procedurally precluded – i.e., any claim that either should

15   have been or already has been presented for review.  Ariz. R. Crim. P. 32.2(a)(2) and (a)(3).

16   After all precluded claims have been dismissed as either previously submitted or waived, the

17   PCR court reviews the remainder of the claims to determine the existence of any colorable

18   claim entitling the petitioner to relief.  *See State v. D'Ambrosio*, 156 Ariz. 71, 73, 750 P.2d

19   14, 16 (1988) (a colorable claim is one in which if the allegations are true, it might have

20   changed the outcome of the proceeding).  For all colorable claims, the court holds an

21   evidentiary hearing pursuant to Rule 32.8.  If there is no colorable claim, the PCR court

22   summarily dismisses the successive petition with prejudice.  Ariz. R. Crim. P. 32.6(c).

23        *Petitioner's Third PCR*

24        As previously noted, following the United States Supreme Court's decision in *Ring*,

25   this Court authorized Petitioner to initiate successive state PCR proceedings.  To satisfy Rule

26   32.2(b), Petitioner presented a *Ring* claim, an exceptional claim based on a significant change

27   in the law under Rule 32.1(g).  Petitioner further indicated that he intended to raise other

28   exceptional claims in his petition and that meritorious reasons existed for not raising these

claims in an earlier PCR petition. (*Id.* at 4.)  In his notice, Petitioner did not include a factual or legal basis for any proposed claims and did not offer any substantiating reasons why such potential claims would be entitled to successive petition treatment, in contravention of Rule 32.2(b).  (*Id.* at 4-5.)  However, because Petitioner raised a successive *Ring* claim based on a significant change in the law, the PCR court appointed counsel and established a deadline for the filing of a successive petition.  (*Id.* at 8-9, 12-13.)

In the successive PCR petition, Petitioner raised a *Ring* claim as well as a number of other claims this Court had previously found procedurally barred because they had not been exhausted in state court. (Dkt. 29 at 38-39.)  Petitioner asserted in his petition that the claims were excepted from Rule 32.2 preclusion because they constituted claims of actual innocence under Rule 32.1(h).[18]  (Dkt. 116 at 178, 186-87.)  Following the filing of his successive petition, Petitioner indicated that he intended to submit motions for expert assistance and discovery. (Dkt. 116 at 86.)  Prior to summary dismissal of the PCR petition, the record does not disclose the filing of any such motions.

In response to the petition, Respondents contended that, other than the *Ring* claim, Petitioner had not identified any claims that fell within an exception to preclusion and asked the PCR court for summary dismissal.  (*Id.* at 165-66.)  After the response and Petitioner's reply, the PCR court scheduled oral argument. (Dkt. 153.)  At argument, Petitioner indicated he had submitted colorable claims of actual innocence and that if the court scheduled an

---

[18]     Rule 32.1(h) defines actual innocence as follows: "The defendant demonstrates by clear and convincing evidence that the facts underlying the claim would be sufficient to establish that no reasonable fact-finder would have found defendant guilty beyond a reasonable doubt, or that the court would not have imposed the death penalty." Ariz. R. Crim. P. 32.1(h) (West 2002).  In the comment construing the subsection, the Arizona Supreme Court stated that a claim of actual innocence was added because in *Herrera v. Collins*, 506 U.S. 390 (1993), the United States Supreme Court ruled that claims of actual innocence were not cognizable under the federal habeas corpus remedy.  Ariz. R. Crim. P. 32.1(h) (comment).  In *Herrera*, the Supreme Court made clear that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Id.* at 400.

evidentiary hearing, he would request the appointment of an investigator and a mental health expert. (*Id.* at 13-15.)

Pursuant to Rule 32.2(b), the PCR court concluded that Claims 9(F)-(I) were not properly brought as actual innocence claims and stated its intention to summarily dismiss them. (Dkt. 116 at 221-23.) In accordance with Rule 32.6(c), the PCR court identified them as procedurally precluded. However, in finding the claims procedurally precluded, the PCR court ambiguously ruled that they were precluded because they either had already been submitted and ruled upon (under Rule 32.2(a)(2)) or had never before been presented and were waived (under Rule 32.2(a)(3)). *See Lambright v. Stewart*, 241 F.3d 1201, 1205 (2001) (procedural default based on an ambiguous order that does not clearly rest on an independent and adequate state ground is not sufficient to preclude federal review). As this Court previously ruled in considering Petitioner's motion to amend:

> If an Arizona state court, pursuant to Rule 32.2(a)(2), precludes further review of a claim because it has been previously raised and litigated, then such a claim is exhausted and available for federal habeas review. If the state court, pursuant to Rule 32.2(a)(3), bars a claim because it could have been raised on direct appeal or in a previous PCR proceeding but was not, that claim is waived and procedurally defaulted. However, if the state court does not distinguish which claims are precluded from further review under (a)(2) and which claims are precluded as waived under (a)(3), then the decision is ambiguous and does not clearly and expressly rely on an independent and adequate state procedural default. *See Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996) (reviewing the distinction between Arizona Rule of Criminal Procedure 32.2(a)(2) and 32.2(a)(3) and concluding that ambiguous decisions do not foreclose federal habeas review of the claims encompassed in that ruling).

(Dkt. 133 at 9.)

*Discussion*

Petitioner contends that the limitations of § 2254(e)(2) do not apply because the state court curtailed his effort to develop these claims by denying funding for an expert and an investigator and by denying an evidentiary hearing during his third PCR proceeding. However, Petitioner did not formally request resources prior to the PCR court's determination that his claims failed to satisfy the actual innocence exception to preclusion. This failure to request resources does not satisfy the standard requiring that a petitioner

1  diligently undertake his own search for evidence. *See Williams*, 529 U.S. at 435.

2  More critically, the Arizona courts have made clear that the appropriate time to

3  present IAC allegations is in the first PCR proceeding. *See State v. Spreitz*, 202 Ariz. 1, 2,

4  39 P.3d 525, 526 (2002); *Smith v. Stewart*,  202 Ariz. 446, 450, 46 P.3d 1067, 1071 (2002).

5  In *Smith*, decided before Petitioner filed his third PCR petition, the Arizona Supreme Court

6  reiterated that petitioners are barred from filing IAC claims in successive PCR petitions:

7  Rule 32.2 is a rule of preclusion designed to limit [review of claims in the PCR
   court], to prevent endless or nearly endless reviews of the same case in the
8  same trial court.  If the merits were to be examined on each petition, Rule 32.2
   would have little preclusive effect and its purpose would be defeated. . . . For
9  example, if a petitioner asserts ineffective assistance of counsel at sentencing
   [in an initial petition], and in a later petition, asserts ineffective assistance of
10 counsel at trial, *preclusion [of the later claim] is required without examining
   facts*.  The ground of ineffective assistance of counsel cannot be raised
11 repeatedly.

12 *Id.* (emphasis added).

13 Petitioner did not include the IAC allegations contained in Claims 9(F)-(I) in his initial

14 PCR petition.  Rather, he couched the allegations as actual innocence claims in his third PCR

15 proceeding.  The PCR court rejected this approach, relying in part on the *Smith* decision.  By

16 not raising all of his IAC claims in his first PCR petition, Petitioner ran the risk of not having

17 the claims considered on the merits.  Indeed, in light of the Arizona Supreme Court's back-

18 to-back decisions in *Spreitz* and *Smith*, it was not reasonable for Petitioner to expect that the

19 PCR court would address Claims 9(F)-(I) on the merits, let alone provide resources for

20 developing the claims during the third PCR proceeding.  Thus, this Court concludes that the

21 PCR court's summary rejection of the claims and its denial of an evidentiary hearing did not

22 curtail Petitioner from diligently developing Claims 9(F)-(I) in state court.  It was Petitioner

23 who curtailed the state court from reviewing the merits of these claims by not presenting and

24 factually developing them in either his first or second PCR proceeding, during which he

25 presented other allegations of counsel's ineffectiveness.

26 Pursuant to § 2254(e)(2), Petitioner's lack of diligence in state court prohibits this

27 Court from granting further evidentiary development of Claims 9(F)-(I), and he has not

28

1   attempted to meet the statute's exceptions.[19]  Because Petitioner is not entitled to develop

2   these claims through expansion of the record or an evidentiary hearing, he has not established

3   good cause for discovery.  *See Boyko*, 259 F.3d at 792 (discovery should not be allowed to

4   augment the merits of a claim unless petitioner was diligent under 28 U.S.C. § 2254(e)(2));

5   *Murphy v. Bradshaw*, No. C-1-03-053, 2003 WL 23777736, *2 (S.D. Ohio 2003) ("there

6   cannot be good cause to discover facts which could not be presented because a petition is

7   barred from an evidentiary hearing on those facts under 28 U.S.C. § 2254(e)(2)").  Therefore,

8   Petitioner's requests for discovery, expansion of the record, and an evidentiary hearing for

9   Claims 9(F)-(I) are denied.  This Court's review of Claims 9(F)-(I) is limited to the factual

10  record developed in the state court proceedings.  *See Cardwell v. Netherland*, 971 F. Supp.

11  997, 1008 (E.D. Va. 1997), *aff'd, Cardwell v. Greene*, 152 F.3d 331 (4th Cir. 1998),

12  *overruled in part on other grounds*, *Bell v. Jarvis*, 236 F.3d 149 (4th Cir. 2000) (en banc).

13      **Claim 9(F)**

14      Petitioner contends that trial counsel rendered deficient performance in failing to

15  prevent Patrick Allison from testifying to a hearsay statement Petitioner allegedly made to

16  Julie Moore.  At trial, the prosecution questioned Allison, who testified that he overheard

17  Petitioner tell Julie Moore that "[the victim] wouldn't give me the money or the beer so I

18  burned him."  (RT 6/6/90 at 107.)  As the Court has previously explained, this out-of-court

19  statement was not hearsay but the admission of a party opponent.  (*See* Dkt. 133 at 24.)

20  Because Allison's statement was admissible under Arizona Rule of Evidence 801(d)(2)(A),

21

22      [19]      Petitioner also alleges that this Court denied him investigative and expert

23  resources to develop these claims during habeas proceedings and that had he received such

24  resources he could have more clearly alleged what additional testimony would be offered at

    a federal evidentiary hearing.  (Dkt. 140 at 28, 35, 45-46, 52.)  Petitioner's allegation is

25  without merit.  The habeas record discloses that Petitioner never requested resources to

26  factually develop Claim 9.  More importantly, as this Court has already pointed out, factual

    development during habeas proceedings is constrained by § 2254(e)(2).  Thus, even had the

27  Court provided additional investigative and expert resources to assist in the development of

    evidence to support Petitioner's claims, in light of Petitioner's lack of diligence in state court,

28  such evidence could not be considered.

1    counsel's failure to move for its preclusion was not unreasonable.  *See Kimmelman v.*

2    *Morrison*, 477 U.S. 365, 375 (1986) (in order to demonstrate that counsel failed to litigate

3    an issue competently, a petitioner must prove that the issue was meritorious); *Wilson v.*

4    *Henry*, 185 F.3d at 990 (same).

5         Next, Petitioner contends that trial counsel should have tested the admissibility of

6    Allison's statements by requesting a preliminary determination of admissibility outside the

7    presence of the jury under Arizona Rule of Evidence 104.  Rule 104 provides for a hearing

8    outside the presence of the jury to determine the admissibility of testimony.  *See* Ariz. R.

9    Evid. 104(a) (2002).  However, in this matter, counsel did not perform deficiently because

10   Allison's statements were properly admitted.  Moreover, Rule 104 could not be used to

11   prohibit the statements from being admitted.  Rule 104 makes it clear that such a proceeding

12   cannot be used to limit or prohibit a party from introducing evidence before the jury that is

13   relevant to weight or credibility.  *See id.*, Rule 104(e); *see also State v. Lehr*, 201 Ariz. 509,

14   517, 38 P.3d 1172, 1180 (2002).  Allison's statements were admissible at trial because it was

15   up to the jury to determine Allison's credibility and what weight to give his statements.

16        Finally, Petitioner contends that trial counsel's cross examination of Allison was

17   deficient because it is probable that counsel could have impeached Allison with counsel's

18   pretrial interview of him which may have indicated that Allison came to know this

19   information from Julie Moore, not directly from Petitioner.  (Dkt. 134 at 64.)   Such

20   speculation is insufficient.  *See Bragg*, 242 F.3d at 1088 (petitioner must do more than

21   speculate about the testimony of a witness to support deficient performance in an ineffective

22   assistance claim).  In addition, Petitioner has failed to affirmatively establish prejudice under

23   *Strickland*.  Therefore, he is not entitled to relief on Claim 9(F).

24   **Claim 9(G)**

25        Petitioner contends that trial counsel performed deficiently by not calling Julie Moore

26   as a witness at trial to rebut Patrick Allison's testimony that he overheard Petitioner tell

27

28

Moore that he had murdered the victim.[20] (Dkt. 140 at 31.) Petitioner also contends that trial counsel performed deficiently by not conducting a competent, recorded pretrial interview of Moore, despite the fact that Moore was listed as a witness for the prosecution. (*Id.* at 33-34.)

Petitioner's record on appeal contains a pretrial summary of witness interviews that were conducted by Detective Michael Chambers of the Phoenix Police Department as part of his homicide investigation. (ROA 33; RT 6/6/90 at 179-81.) This summary was compiled by Alan Simpson, counsel for Patrick Allison, and provided to Petitioner's trial counsel. (ROA 33 at 11-12.) Julie Moore, Petitioner's girlfriend, gave her witness account to the police as part of their investigation. She informed the police that Petitioner robbed Marcella Bonita and her friends of about six beers and then left to consume the beers. (*Id.* at 3-4.) Later Petitioner determined that he would go back to the group and see if they had any more money or beer. (*Id.* at 4.) Although Moore did not witness the confrontation with the victim, Petitioner later admitted to her that "he poured gasoline on an Indian guy and lit it." (*Id.*)

At trial, counsel's main defense was misidentification; he attempted to prove that it was Allison, not Petitioner, who murdered the victim. Given the information trial counsel had regarding Moore's statement to the police, trial counsel's tactical decision not to call Moore as a witness for Petitioner was not deficient performance in violation of *Strickland*. At trial, counsel is given wide discretion with respect to tactical decisions. *See United States v. Ferreira-Alameda*, 815 F.2d 1251, 1254 (9th Cir. 1986); *United States v. Appoloney*, 761 F.2d 520, 525 (9th Cir. 1985). This discretion applies to counsel's decisions about the handling of witnesses. *See Bragg*, 242 F.3d at 1088 (stating that the failure to interview a witness does not establish ineffective assistance when the person's account is otherwise fairly known to defense counsel); *Santos*, 741 F.2d at 1169 (tactical decision of counsel not to call a witness not ineffective assistance of counsel); *see also United States v. Rice*, 449 F.3d 887, 898 (8th Cir. 2006) (stating that trial counsel enjoys a strong presumption that his decisions

---

[20] Petitioner has informed the Court that Julie Moore is now deceased. (Dkt. 140 at 35.)

regarding which witnesses to call were reasonable).  The Court concludes that counsel was not ineffective for not calling Moore as a hostile witness, given counsel's awareness that hours after the homicide, Moore informed Detective Chambers that Petitioner admitted the murder to her, confirming that it was not committed by Patrick Allison. *See Strickland*, 466 U.S. at 689 (stating that defendant must overcome the presumption that, under the circumstances, the challenged act or omission might be considered sound trial strategy); *Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (same).

Moreover, even if this Court expanded the record to include trial counsel's billing records, the Court's consideration of this evidence does not change the outcome. (*See* Dkt. 134, Ex. A.)  Counsel's billing records contain cryptic notes of conversations he had with both Julie Moore and Detective Chambers.  These conversations occurred prior to a pretrial conference. (*See* Dkt. 140 at 33.)  In counsel's conversation with Moore, Moore apparently denied telling Detective Chambers that Petitioner murdered the victim and denied that Petitioner admitted the murder to her.  However, in counsel's conversation with Detective Chambers, Chambers apparently confirmed that Moore told Chambers that Petitioner confessed the murder to her.  (Dkt. 134, Ex. A; Dkt. 141 at 20-21.)

This information does not alter the Court's conclusion that counsel did not perform deficiently in making a valid, strategic decision not to call Moore.  Other than a cryptic note, there is no basis to support that Moore would not have been a hostile witness to the defense case.  Even though there is some evidence of a conflicting account, the record demonstrates that shortly after the incident, Moore implicated Petitioner as the murderer.  (ROA 33; RT 6/6/90 at 179-81.)  Counsel's decision not to call Moore as a witness was not unreasonable.

Absent deficient performance, Petitioner cannot establish IAC.  Therefore, Petitioner is not entitled to relief on Claim 9(G).

**Claim 9(H)**

Petitioner alleges that counsel's performance with respect to forensic evidence was ineffective.  He contends that trial counsel failed to properly investigate and secure expert assistance to test the blood evidence. (Dkt. 140 at 36-44.)  Petitioner further asserts that trial

counsel rendered deficient performance in his cross-examination of the prosecution's expert

because counsel did not attempt to rebut the expert's conclusion that the absence of gasoline

odor from Petitioner's clothes was attributable to escaping gas vapors. (*Id.*) He contends

that an expert should have been hired to opine about how quickly gasoline odors dissipate.

(*Id.*)

At trial, the prosecution presented testimony from Craig Ballard, a supervisor at the

City of Phoenix Crime Laboratory, with expertise in the areas of blood and alcohol testing.

Mr. Ballard testified that the Phoenix Police Department asked him to analyze blood obtained

from Petitioner, Patrick Allison, and the victim, and to test a blood spot on the pants

Petitioner was wearing at the time of the murder. (RT 6/7/90 at 51-52.)  Mr. Ballard ran

different tests on the blood, testing for blood type as well as blood enzyme typing.  Based

upon the results of this analysis, Ballard testified that the blood on Petitioner's pants matched

that of the victim, Bahe. (*Id.* at 54-55.)  On cross-examination, Ballard acknowledged that

he could not conclusively state that the blood on Petitioner's pants specifically came from

Bahe. (*Id.* at 59.)  On re-direct, Ballard summarized the results of the blood enzyme testing,

explaining that Bahe's blood and the blood on Petitioner's pants were a match based on the

tests conducted, but that the results did not conclusively establish that the blood on

Petitioner's pants was that of Bahe. (*Id.* at 61-63.)  Ballard testified:

> MR. LEVY: And finally, with regard to the conclusivity of it, did you
> further determine the percentage of your – degree of your conclusivity and the
> general population of blood types between Bahe's blood and the sampling of
> the gray pants?
>
> MR BALLARD: Yes, I did.
>
> MR. LEVY: And what was that?
>
> MR. BALLARD: That they both represent about two percent of the
> population, that series of blood types, one plus, one minus, the two B's and the
> one and one.
>
> MR. LEVY: Therefore, based thereon, could you state to a reasonable
> degree of scientific probability that Bahe's blood matched the sample on the
> gray pants?
>
> MR. BALLARD: I can state it this way: That I could not exclude
> Bahe's blood from contributing to the bloodstain on those gray pants, and he

1    matches those blood types that I've done there.

2  (*Id.* at 63-64.) Ballard also acknowledged that Allison and Bahe had the same general blood

3  type but that they had different blood enzyme typing, which distinguished Allison's blood

4  from the victim's and the blood on Petitioner's pants.  (*Id.* at 59, 63.)

5    As previously discussed, Petitioner failed to develop the factual basis of Claim 9(G)

6  in state court.  In *Wildman*, 261 F.3d at 838, the Ninth Circuit held that a habeas petitioner

7  has the burden of establishing that trial counsel should have retained a particular expert at

8  trial and affirmatively demonstrating that he was prejudiced by counsel's failure to do so.

9  Because Petitioner made no showing in state court regarding what a blood expert for the

10  defense would have found, he has not established that counsel's allegedly deficient

11  performance had an effect on the outcome of the trial.  *Strickland* specifically instructs

12  habeas courts that "[i]t is not enough for the defendant to show that the errors had some

13  conceivable effect on the outcome of the proceeding." 466 U.S. at 693.  Rather, to entitle the

14  petitioner to relief, any deficiencies in counsel's performance must be prejudicial to the

15  defense.  *Id.* at 692.  Because Petitioner made no showing of prejudice, the Court need not

16  evaluate trial counsel's performance.[21]  *Id.* at 697 (stating that "a court need not determine

17  whether counsel's performance was deficient before examining the prejudice suffered by the

18  defendant as a result of the alleged deficiencies.")

19    Next, Petitioner argues that trial counsel rendered deficient performance in his cross-

20  examination of Ballard because he did not attempt to rebut Ballard's conclusion that the

21  --------------------

22  [21]    Reaching the issue of prejudice first does not necessarily mean that the Court
believes that counsel rendered deficient performance.  Rather, it may have been reasonable
23  for counsel not to hire an expert unless counsel had sufficient reason to believe that the test
conducted by the state was faulty.  In *Grigsby v. Blodgett*, 130 F.3d 365, (9th Cir. 1997), the
24  petitioner was involved in an incident where both the victim and the petitioner had been shot.
Petitioner argued that trial counsel should have tested the blood in the carpet around where
25  the victim was shot because if the blood was tested, it may have exculpated him from being
the one who shot the victim.  The court ruled that counsel rendered effective performance in
26  *not testing* the blood stain because of counsel's reasonable fear that the blood test would
27  show evidence of the petitioner's blood, as well as the victim's, and further inculpating him
28  in the shooting.

1   complete absence of a gasoline odor from Petitioner's clothes was due to escaping gas

2   vapors.  (Dkt. 140 at 36-44.)  Petitioner contends that an expert should have been hired to

3   opine about the rate at which gasoline odors dissipate.  (*Id.*)

4           At trial, Mr. Ballard testified about the presence of accelerants, such as gasoline, on

5   articles of clothing to be tested.  (*Id.* at 52.)  With regard to accelerants, Ballard testified that

6   he undertook a two-step process.  First, he checked the article for the odor of gasoline; if

7   gasoline vapor was detected by odor, he would test the item for the presence of gasoline.  (*Id.*

8   at 56-57.)  The victim's clothing tested positive for gasoline.  (*Id.* at 57.)  On cross-

9   examination, Ballard testified that when he checked Petitioner's clothes, he did not detect an

10  odor of gasoline.  (*Id.* at 59-61.)

11          As previously indicated, Petitioner failed to develop the factual basis of this argument

12  in state court.  Because Petitioner made no showing regarding what findings an expert would

13  have made regarding the rate at which gasoline odors dissipate from clothing or any findings

14  arising from the testing of Petitioner's clothing, he has not established that he was prejudiced

15  by counsel's performance.  *See Wildman*, 261 F.3d at 838.

16          Finally, Petitioner alleges that counsel rendered deficient performance in his cross-

17  examination of Ballard.  Petitioner accuses the prosecution expert of making a mistake

18  during direct examination when he testified that the group of tests administered on the blood

19  samples showed that the blood on Petitioner's pants did not match Allison's blood.

20  Petitioner further accuses Ballard of changing his testimony on cross-examination when

21  Ballard testified that both Allison and Bahe had Type O blood, the same blood type as the

22  blood on Petitioner's pants.  Petitioner argues that Ballard should have been vigorously

23  cross-examined about mistakes in his testimony because Ballard, in his final typewritten

24  report, handwrote a change in the blood type of the sample on Petitioner's pants, indicating

25  that the blood on the pants was "Type O."

26          At trial, Ballard explained that he performed a number of tests on the blood samples

27  that he received in this case.  (RT 6/7/90 at 52-56.)  The first test was for general ABO blood

28  type.  (*Id.*)  Ballard next tested the samples for blood enzyme type.  (*Id.*)  Ballard did not

1   testify that the blood on the pants was a different blood type than that of Allison. (*Id.* at 54-

2   55.) Rather, Ballard testified, referring to all of the tests administered, that the blood stain

3   on the pants did not match Allison's blood sample. (*Id.*) On cross-examination, trial counsel

4   clarified Ballard's testimony, confirming that Allison and Bahe had the same ABO blood

5   type. (*Id.* at 59.) With respect to the alleged mistake on Ballard's report, the report is not

6   a part of the state court record. More importantly, even if it were a part of the record, the

7   report merely shows that Ballard took steps to ensure that the report was accurate. (*See id.*

8   at 53-56.) Counsel's cross-examination of Ballard was neither deficient nor prejudicial.

9   Petitioner is not entitled to relief on Claim 9(H).

10       **Claim 9(I)**

11       Petitioner indicates that the police obtained a blood sample from him shortly after his

12   arrest. He argues that trial counsel should have tested the sample for alcohol content and that

13   the failure to do so constituted deficient performance because intoxication played a vital role

14   in his defense. Petitioner contends that his state of intoxication prevented him from forming

15   the requisite mental state for first degree murder. (Dkt. 140 at 48-50.) Further, Petitioner

16   asserts that the failure to test his blood alcohol prejudiced him at sentencing and as a result

17   he received the death penalty. (*Id.* at 50.)

18       On the day of Petitioner's arrest, Detective Chambers requested and received

19   Petitioner's consent to have a blood sample taken. (RT 6/6/07 at 186.) A registered nurse

20   obtained samples from both Petitioner and Patrick Allison and gave the samples to Detective

21   Chambers. (RT 6/7/90 at 49-50.)

22       Petitioner argues that trial counsel should have tested his blood sample for alcohol

23   content for use during trial and sentencing. (Dkt. 140 at 48-50.) In a prior Order, the Court

24   addressed a similar allegation. (*See* Dkt. 133 at 13-15.) Previously, in Claim 1, the Court

25   considered Petitioner's allegation that the trial court erred in failing to instruct the jury that

26   it could not consider his intoxication in determining his mental state at the time of the

27   murder. The Court ruled as follows:

28       At the time of Petitioner's trial, Arizona law only allowed introduction of

intoxication evidence when specific intent was a necessary element of the crime charged. *See Schurz*, 176 Ariz. at 54-55, 859 P.2d at 164-65 (citing A.R.S. § 13-503, which, in pertinent part, provided that the jury may only consider voluntary intoxication in determining a culpable mental state when the culpable mental state of intentionality is a necessary element of the offense). Under Arizona's first degree murder statute, the State was required to prove that Petitioner had either an intentional or knowing mental state that his conduct will cause death. *See* A.R.S. § 13-1105(A)(1). Where a defendant is charged, in part, with knowingly committing first degree murder, a voluntary intoxication instruction is not permitted. *See State v. Rankovich*, 159 Ariz. 116, 122, 765 P.2d 518, 524 (1988). In compliance with state law, the court refused to allow him to introduce intoxication evidence as a defense to the "knowing" mental state and refused to give a jury instruction indicating that voluntary intoxication was a defense to the first degree murder charge.

(*Id.* at 13-14 (footnotes excluded)). Ultimately, this Court held that the state court did not violate the Constitution by not giving a jury instruction which would have allowed the jury to consider Petitioner's intoxication in determining his mental state at the time of the crime. (*Id.* at 15.)

Although Petitioner contends that his intoxication played a pivotal role in his defense, the trial court excluded evidence of intoxication regarding Petitioner's mental state at the time of the crime. Therefore, trial counsel did not perform deficiently in failing to have Petitioner's blood tested for intoxication for use during the guilt phase of his trial.

Next, Petitioner contends that counsel's failure to obtain the blood alcohol test results prejudiced him at sentencing. (*Id.* at 50.) At sentencing, the state courts thoroughly considered Petitioner's intoxication at the time of the crime. In a previous Order, this Court reviewed the state court's consideration of whether Petitioner's intoxication evidence constituted either a statutory or a non-statutory mitigating circumstance at sentencing. (Dkt. 133 at 19-23.)

Trial counsel presented Petitioner's intoxication at sentencing. He presented it in a sentencing memorandum to the trial court and also through the report of the mitigation psychologist, Dr. Donald Tatro, which was attached to the sentencing memorandum. (ROA 134 at 8-11; Tatro Report at 1-2.) Trial counsel did not perform deficiently in failing to obtain any additional cumulative evidence of intoxication for use at sentencing. Petitioner is not entitled to relief for Claim 9(I).

1       **Claims 10(C), 11(A), 11(C): Ineffective Assistance of Counsel at Sentencing**

2       In support of these sentencing IAC claims, Petitioner seeks broad discovery and an

3 evidentiary hearing to present testimony from trial counsel, family members, a mitigation

4 specialist, an addiction specialist, a cultural expert, a *Strickland* expert, and others. (Dkt. 140

5 at 58-60, 74-77, 80-81.)  He also seeks to expand the record with numerous mitigation-

6 related declarations and records and requests discovery from the Arizona Supreme Court on

7 the question of whether it would have reduced his sentence to life imprisonment had it been

8 provided a "competent" mental health report.  (*Id.* at 94-97, 80-81.)

9       **Diligence in State Court**

10       Petitioner contends that in litigating his successive third PCR petition he diligently

11 attempted to develop Claims 10(C), 11(A), and 11(C) but the state court curtailed his efforts

12 by denying investigative and expert funding and by failing to grant his request for an

13 evidentiary hearing.  (Dkt. 140 at 81-90; Dkt. 153.)

14       In his third PCR proceeding, Petitioner proffered the following documents in support

15 of his IAC-sentencing claims:   Declaration of Arlene Schurz (Petitioner's mother),

16 Declaration of Sharon Apkaw (Petitioner's aunt), Declaration of Joycelyn Martinez

17 (Petitioner's cousin), Declaration of Sister Mary Martha Carpenter (one of Petitioner's

18 elementary school teachers), medical records from 1964 to 1975, a 1977 Camelback Hospital

19 Discharge Summary, a 1978 New Foundation Treatment Summary and Review, a 1979

20 Adobe Mountain Psychological Evaluation, and a 1990 psychological evaluation from Dr.

21 Jack Potts.  (Dkt. 116 at 90-159.)  Because these items were attached to Petitioner's third

22 PCR petition, they are already part of the relevant state court record and expansion of the

23 record to include these items is unnecessary.

24       Regarding the new exhibits Petitioner seeks to introduce through expansion of the

25 record, including Trial Counsel's Billing Records, the Affidavit of Mary Durand, the

26 Declaration of David Hedgecock, the Declaration of Michael Todd, the Death Certificates

27 of Petitioner's Family Members, and the Letter to Arlene Schurz, the Court concludes that

28 Petitioner failed to exercise diligence.  (*See* Dkt. 134, Exs. A, B, Q, R, S; Dkt. 140, Ex. 3.)

These items were readily available to Petitioner at the time of his third PCR proceeding, but he did not provide them to the state court. *Cf. Landrigan v. Schriro*, 441 F.3d 638, 643 (9th Cir.) (en banc), *overruled on other grounds*, 127 S. Ct. 1933 (2007) (finding Arizona petitioner diligent in factually developing claim in state court where various declarations of available witnesses and relevant documentary evidence were attached to state PCR petition). In addition, Petitioner presented the crux of Claim 11(A) in his second PCR petition but offers no explanation why this additional evidence was not available and presented to the PCR court at that time. As this Court has previously determined, Petitioner did not diligently attempt to develop the factual basis of Claims 10(C) or 11(A) in his second PCR proceeding. (*See* Dkt. 128.)  Consequently, Petitioner's earlier motion for evidentiary development of these claims was denied. (*Id.*)

More critically, as explained with regard to Claims 9(F)-(I), Petitioner's failure to develop these claims during his first or second PCR proceeding negates any assertion that he should be found diligent based on his efforts during the third PCR proceeding. As already noted, Arizona's rules and precedent at the time of Petitioner's third PCR proceeding dictated that IAC claims raised in a successive PCR petition be dismissed summarily without examination of the facts. *Smith*, 202 Ariz. at 450, 46 P.3d 1067 at 1071. Thus, such a claim would not likely be heard on the merits. This Court concludes that Petitioner did not act with diligence in developing the facts supporting his IAC sentencing claims.[22] *Id.* Therefore, Petitioner's requests for an evidentiary hearing and expansion of the record are denied. Because Petitioner is not entitled to develop these claims, he has not established good cause for discovery. *Boyko*, 259 F.3d at 792.

---

[22]     Petitioner again alleges that this Court's denial of investigative and expert resources inhibited his ability to clearly identify additional testimony necessary for a federal evidentiary hearing. (Dkt. 140 at 59, 77, 81; *see* Dkt. 78.) However, as already explained, factual development is necessarily constrained by § 2254(e)(2). *See supra* note 19. In its September 2005 order denying Petitioner's request for an evidentiary development, the Court thoroughly reviewed Petitioner's attempts to develop his sentencing IAC claims in state court and determined that he had failed to exercise diligence. (Dkt. 128 at 8-19.) Thus, even had the Court allowed the requested resources, any new evidence could not be considered.

1        **Claim 10(C)**

2            Petitioner contends that if trial counsel had provided his mental health expert, Dr.

3    Tatro, with additional mitigation materials, Dr. Tatro would have reached different

4    conclusions in the report that he submitted to the trial judge prior to sentencing. (Dkt. 140

5    at 53-58.) Specifically, Petitioner contends that if Dr. Tatro had been properly prepared, he

6    may have concluded that Petitioner suffered from organic brain damage or mental

7    retardation. (Dkt. 144 at 44.)

8            Standard of review

9            Respondents contend that Claim 10(C) is not a separate claim but is subsumed by the

10   IAC allegations in Claim 11(A). (Dkt. 141 at 31-32.) According to Respondents, because

11   this claim is encompassed by Claim 11(A), the state court ruling is entitled to deference

12   under 28 U.S.C. § 2254(d)(1). (*Id.*) Respondents are incorrect; Claim 10(C) is not subsumed

13   under Claim 11(A). In his amended petition, Petitioner raised Claim 10(C) as a separate IAC

14   claim (Dkt. 14 at 64-65. *See Strickland*, 466 U.S. at 690 (stating that an IAC claim is a

15   claim which identifies a particular act or omission of counsel alleged not to have been the

16   result of reasonable professional judgment).

17           Petitioner did not exhaust Claim 10(C) in either his first or second PCR.

18   Consequently, this Court found it procedurally defaulted. (*See* Dkt. 29 at 39-41). Petitioner

19   did not raise this claim until his third PCR petition. (Dkt. 116 at 59-61.) The state court

20   ruling dismissing this claim did not provide a merits rationale. (*See* Dkt. 133 at 9-10.)

21   Therefore, Claim 10(C) will be reviewed *de novo* by this Court. *See Pirtle*, 313 F.3d at 1167.

22           The *Strickland* Standard

23           The right to effective assistance of counsel applies not just to the guilt phase, but

24   "with equal force at the penalty phase of a bifurcated capital trial." *Silva v. Woodford*, 279

25   F.3d 825, 836 (9th Cir. 2002) (quoting *Clabourne v. Lewis*, 64 F.3d 1373, 1378 (9th Cir.

26   1995)). Counsel has "a duty to make reasonable investigations or to make a reasonable

27   decision that makes particular investigations unnecessary," and "a particular decision not to

28   investigate must be directly assessed for reasonableness in all the circumstances, applying

a heavy measure of deference to counsel's judgments." *Hayes v. Woodford*, 301 F.3d 1054, 1066 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 691).  A reasonable mitigation investigation must involve not only the search for good character evidence but also evidence that may demonstrate that the criminal act was attributable to a disadvantaged background or to emotional and mental problems. *Boyde v. California*, 494 U.S. 370, 382 (1990).

With respect to *Strickland*'s prejudice prong, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.  In evaluating prejudice, the Court explained in *Wiggins v. Smith*, 539 U.S. 510, 534 (2003), that "we reweigh the evidence in aggravation against the totality of available mitigating evidence."  The "totality of the available evidence" includes "both that adduced at trial, and the evidence adduced in the habeas proceeding." *See Wiggins*, 539 U.S. at 536 (quoting *Williams*, 529 U.S. at 397-98); *Smith (Bernard) v. Stewart*, 140 F.3d 1263, 1270 (9th Cir. 1998) ("We are asked to imagine what the effect might have been upon a sentencing judge, who was following the law, especially one who had heard the testimony at trial.  Mitigating evidence might well have one effect on the sentencing judge, without having the same effect on a different judicial officer.").

Discussion

Petitioner alleges that counsel did not properly prepare Dr. Tatro for the penalty phase proceeding and that if Dr. Tatro had been provided with the necessary background information he might have concluded that Petitioner had organic brain damage or mental retardation. (Dkt. 144 at 44.)

The Ninth Circuit has stated that counsel at sentencing have an "obligation to conduct an investigation which will allow a determination of what sort of experts to consult.  Once that determination has been made, counsel must present those experts with information relevant to the conclusion of the expert." *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999).  Petitioner alleges that trial counsel failed to provide Dr. Tatro with the information necessary for the preparation of a complete mental health report at sentencing.  (Dkts. 140

at 53-55; 144 at 41-45.)  Petitioner asserts that an expert opinion should be based primarily upon "past psychiatric history, family history, criminal activity and medical records."  (Dkt. 140 at 54.)  Although Petitioner emphasizes trial counsel's alleged deficiencies, the Court, following *Strickland*, 466 U.S. at 697, finds that this IAC allegation may be appropriately resolved by consideration of the prejudice prong.

As discussed above, Petitioner failed to exercise diligence to develop the facts of this claim.  None of the exhibits Petitioner attached to his third PCR petition included a suggestion from a mental health expert that Petitioner may have organic brain damage or mental retardation. (Dkt. 116 at 89-159.) Consequently, in his merits briefing, Petitioner has done nothing more than speculate that if additional information had been provided to Dr. Tatro, he or another mental health expert would have opined that Petitioner had organic brain damage or mental retardation. (*See* Dkt. 144 at 44.)  Such speculation is insufficient.  *See Wildman*, 261 F.3d at 839 (prejudice has not been shown when petitioner merely speculates what an expert might have said if retained); *Grisby*, 130 F.3d at 373 (same); *see also Davis v. Woodford*, 384 F.3d 628, 647 (9th Cir. 2004) (discussing a declaration submitted by a psychiatrist to establish substantive incompetence at a capital sentencing proceeding and stating that an expert opining about a petitioner's incompetency is rank speculation if the expert does not definitively indicate whether a petitioner was incompetent at the time of sentencing).

As noted above, in assessing prejudice based on counsel's deficient performance at sentencing, the habeas court adds the omitted evidence to the mitigating evidence presented at sentencing and reweighs the totality of the mitigating evidence against the aggravating evidence to determine whether the omitted evidence might have influenced the sentencer's appraisal of the defendant's moral culpability.  *See Williams v. Taylor*, 529 U.S. at 397-98.  For instance, in *Caro*, all of the petitioner's mental health experts testified at trial that he did not suffer from a mental impairment severe enough to constitute legal insanity or diminished capacity.  165 F.3d at 1226.  During collateral proceedings, however, additional information was gathered which showed that Caro was continuously exposed to neurotoxins (pesticides)

while growing up, and suffered from physical, psychological, and emotional abuse.  *Id.*  Subsequently, Caro was able to establish prejudice because one of his mental health experts concluded that had he been provided with this new neurotoxin information during trial he would have changed his opinion and testified that Caro had a diminished mental capacity, which was an available trial defense in California.  *Id.*

In contrast to *Caro*, Petitioner did not develop and support Claim 10(C) with new mitigating evidence in the form of a medical report diagnosing him with brain damage or mental retardation.  Rather, both in state court and here, Petitioner provided only bare allegations that he suffers from these conditions.  *See supra* note 22.  Absent proof of prejudice, Petitioner cannot establish ineffective assistance of counsel.  Consequently, Claim 10(C) is without merit.

### Claim 11(A)

Petitioner argues that trial counsel performed ineffectively at sentencing because he did not adequately investigate and present available mitigation evidence.  (Dkt. 140 at 60-77.)  He contends that if the additional mitigation he presented during his third PCR proceeding had been offered at sentencing, he would not have been sentenced to death.  (*Id.*)  He further asserts that Claim 11(A) should be reviewed *de novo*.

Respondents contend that the state court ruled on this claim in the second PCR proceeding and that its ruling is entitled to deference under 28 U.S.C. § 2254(d)(1).  (Dkt. 141 at 40.)  Respondents are correct that the PCR court ruled on the substance of this claim as it was presented in the second PCR petition.  (ROA 200.)  Therefore, this Court will first address whether the state court's ruling on this aspect of Claim 11(A) was contrary to or an unreasonable application of *Strickland*.  However, during his third PCR proceeding, Petitioner further developed the factual basis of the claim.  (Dkt. 116 at 49-59.)  Because the state court summarily dismissed Petitioner's revised claim, it did not address the impact of the new evidence appended to the third PCR petition.  Consequently, this aspect of the claim must be reviewed *de novo* by this Court. *See Pirtle*, 313 F.3d at 1167.  This unusual two-tier review of Claim 11(A) is necessitated, in part, by the irregular manner in which Petitioner

1    raised this claim in state court.

2         Second PCR Proceeding

3         In his second PCR petition, Petitioner argued that trial counsel performed ineffectively

4    at sentencing by not adequately investigating and presenting available mitigation.  (ROA

5    189.)  This Court previously summarized the performance of trial counsel at sentencing:

6              After Petitioner's June 11, 1990 conviction, counsel sought and was
         granted the appointment of an mental health expert, Dr. Donald Tatro, for
7         purposes of sentencing.  (ROA 116.)  On September 17, 1990, counsel
         submitted a 33-page memorandum outlining relevant mitigating factors. (ROA
8         134.)  Attached to the memorandum were a 15-page psychological report from
         Dr. Tatro; letters from Petitioner's mother and aunt; copies of Petitioner's
9         grade school records, G.E.D. certificate and certificate of completion from a
         substance abuse program; letters from family friend, Cecil Rovie, and Sister
10        Martha Mary Carpenter.

11             In counsel's presentation of relevant mitigation (ROA 134), he first
         discussed residual doubt about Petitioner's level of participation in the crime.
12        Next, counsel focused on Petitioner's intoxication at the time of the crime,
         arguing that such intoxication rose to a statutory mitigating circumstance.
13        Petitioner's alleged intoxication included significant ingestion of alcohol prior
         to the crime and an amount of heroin.  Counsel argued that Petitioner not only
14        was intoxicated at the time of the crime but also had a long-term substance
         abuse problem with alcoholism.  Next, counsel emphasized the dramatic
15        disparity between co-defendant's sentence of only probation and Petitioner
         being eligible for the death penalty.  Next, counsel discussed Petitioner's
16        dysfunctional family history.  Counsel emphasized that Petitioner grew up in
         an environment of alcoholism.   Counsel discussed that Petitioner was
17        surrounded by alcoholic and abusive parents and by other alcoholics visiting
         their home.  After the father left, Petitioner's mother displayed little attention
18        for him, as she tried to support 5 children.  At a young age, Petitioner's mother
         consigned him to an institution.   Counsel argued that the long-term
19        institutionalization of Petitioner had an adverse effect upon him and that as a
         result of his dysfunctional family history, he developed significant and severe
20        psychological problems.  Next, counsel discussed Petitioner's potential for
         rehabilitation and the love of his family and friends.  In support, counsel
21        attached letters from his mother, his aunt, another family friend and an
         elementary school teacher, who all care for Petitioner.  Finally, counsel
22        reiterated the early offer of a plea-bargain in this case for a life sentence.

23             Dr. Tatro's report substantiated Petitioner's mental health problems,
         concluding that he had a mixed personality disorder with passive-aggressive,
24        avoidant and antisocial features.  (ROA 134, Ex. A at 15.)  Dr. Tatro discussed
         Petitioner's long-term substance abuse problem, concluding that Petitioner had
25        a heroin (opiate) dependance and alcoholism.  Dr. Tatro also recounted
         Petitioner's dysfunctional family history growing up on the Pima Indian
26        Reservation in an environment of alcoholic and abusive parents.  Petitioner
         started drinking alcohol and abusing drugs at an early age after his
27        grandmother died.  Such drug abuse included IV use of heroin.  Dr. Tatro
         detailed Petitioner's contacts with institutions, with Petitioner first being
28        institutionalized at the age of 12 for substance abuse.  Petitioner's contact with

1  institutions included substance abuse treatment centers, juvenile institutions,
2  and after turning 18, prison.  Dr. Tatro concluded that such long-term
   institutionalization had an adverse effect upon Petitioner.

3      At the presentence hearing, both Sister Martha Mary Carpenter and
   Petitioner's aunt, Sharon Apkaw, testified as character witnesses for Petitioner.
4  (RT 9/19/90.)   Following their presentation, Petitioner issued a short
   allocution, declaring his innocence.  (Id.)  Additionally, the sentencing court
5  was aware of a March 1990 report from Dr. Jack Potts, who performed a pre-
   screening evaluation pursuant to Ariz. R. Crim. P. 11 in order to determine
6  Petitioner's competency to stand trial.  (ROA 44.)  Dr. Potts determined that
   Petitioner was competent to stand trial.  (Id.)  In statements to Dr. Potts,
7  Petitioner self-reported using intravenous heroin and drinking alcohol at the
   time of the crime and relayed that a prior head injury still bothered him.  (Id.)
8  See also Schurz, 176 Ariz. at 53, 859 P.2d at 163.

9  (Dkt. 128 at 9-11.)

10     In his second PCR petition, Petitioner alleged that counsel should have investigated

11  and presented the following areas of mitigation:  possible fetal alcohol syndrome; a history

12  of  alcoholism  among  family  members,  including  his  mother,  father,  grandfather,

13  grandmother, and aunts and uncles; serious and ongoing parental neglect; physical abuse;

14  possible sexual abuse by a priest; serious head injury at age ten; chronic alcohol and

15  substance abuse, including heroin and intravenous drug use and the fact that he began

16  drinking alcohol at age eight; treatment at Camelback Hospital at the age of fourteen or

17  fifteen; long term institutionalization during his formative childhood years; assignment to a

18  drug rehabilitation program; and a dysfunctional family background.  (ROA 189 at 11-13.)

19  Attached to the second PCR petition was an affidavit by Mitigation Specialist Mary Durand,

20  who averred that she had "read the petition for Post Conviction relief and the factual

21  statements alleged therein can all be supported by my investigation."  (Id., Durand Aff. at ¶

22  6.)  However, other than this affidavit, counsel did not present evidence in support of this

23  claim.

24     The PCR Court denied the ineffective assistance of counsel claim as follows:

25     The petition appears to allege that trial counsel was ineffective in his
   investigation and presentation of mitigating evidence at the time of the
26  sentencing hearing.  The Court notes that in this case trial counsel furnished
   the Court with a 32-page sentencing memorandum, a 15-page psychological
27  report from a psychologist selected by the defense, called five witnesses to
   testify at the sentencing hearing which took approximately two hours,
28  furnished the Court with a letter from petitioner's mother, a G.E.D. certificate

1    of petitioner, a Certificate of Completion of Substance Abuse Treatment
     relative to petitioner, a letter from petitioner's aunt (who also testified), and a
2    letter from a family friend with respect to petitioner.

                                        * * *

3            Petitioner's argument seems to be that trial counsel did not "go far
     enough" in this pre-sentence investigation.  However, in reading the petition
4    and the accompanying documents, it appears as though the same type of
     information and evidence which trial counsel presented to the Court is what
5    petitioner suggests should be re-presented to the Court at a new sentencing
     hearing based upon ineffective assistance of counsel.  *The Court is unable to*
6    *find a specific reference to anything which petitioner contends trial counsel*
     *should have discovered but did not discover because of some sort of deficient*
7    *conduct.*  With respect to this issue, this Court is of the opinion and finds that
     trial counsel was not ineffective with respect to his investigation and
8    presentation of mitigating evidence at the time of the sentencing hearing in this
     case.  Rather, it appears that counsel performed in an above average fashion
9    by marshaling the evidence and information which was presented.  Therefore,
     petitioner is not entitled to relief upon this basis.

10   (ROA 200) (emphasis added.)

11           Under the deferential standards set forth in the AEDPA, the Supreme Court has

12   indicated that for an IAC claim to succeed,

13
14           [petitioner] must do more than show that he would have satisfied *Strickland's*
             test if his claim were being analyzed in the first instance, because under §
             2254(d)(1), it is not enough to convince a federal habeas court that, in its
15           independent judgment, the state-court decision applied *Strickland* incorrectly.
             Rather, he must show that [the state court] applied *Strickland* to the facts of his
16           case in an objectively unreasonable manner.

17   *Bell v. Cone*, 535 at 698-99 (citation omitted).  Thus, at issue is whether the decision of the

18   state court is contrary to or an unreasonable application of *Strickland*.

19           As the sentencing record details, trial counsel presented the following areas of

20   mitigation at sentencing: extensive alcoholism in Petitioner's family background, afflicting

21   his mother and father and extended family; serious and ongoing neglect from his mother and

22   father; physical abuse by his mother; loss of loved ones; a history of alcohol and substance

23   abuse (including heroin and intravenous drug use), starting with drinking at age ten; long-

24   term institutionalization during his formative years, between the ages of eleven and twenty-

25   one; assignment to a drug rehabilitation program; dysfunctional family background; a

26   psychological evaluation diagnosing Petitioner with mixed personality disorder with

27   passive/aggressive, avoidant, and antisocial features, alcohol and opiate dependence, and

28   mixed substance abuse.  (*See* ROA 134, Sentencing Memorandum and accompanying

psychological evaluation.)

During the second PCR proceeding, Petitioner argued that additional areas of mitigation should have been presented by trial counsel at sentencing. This information included possible fetal alcohol syndrome, possible sexual abuse by a priest, a serious head injury at age ten, and treatment at Camelback Hospital at the age of fourteen or fifteen. However, other than raising these alleged investigative deficiencies, Petitioner did not submit any proof of prejudice. Rather, Petitioner argued: "We are asking the Court to hold that this impairment and [Petitioner's] difficult background are mitigating circumstances which outweigh the single aggravating circumstance found by the Court." (ROA 189.)

Even were the Court to assume that trial counsel's performance was deficient for failing to investigate and present this alleged additional mitigation during sentencing, Petitioner has not affirmatively proven prejudice. *See Strickland*, 466 U.S. at 693. During his second PCR proceeding, Petitioner failed to substantiate and support his allegations of fetal alcohol syndrome, head injury, sexual abuse by a priest, or treatment at Camelback Hospital. (*See* ROA 189.) His speculative allegations are insufficient to establish prejudice. *See Wildman*, 261 F.3d at 839. Absent proof of additional significant mitigation evidence, the PCR court reasonably concluded that Petitioner did not establish IAC of trial counsel at sentencing. *Id.* Moreover, the judge who presided over the trial, Judge Seidel, also presided over the second PCR proceeding. (ROA 200.) Consequently, the judge was already familiar with the trial record and the mitigating evidence which was presented at trial and sentencing. The judge's familiarity with the trial and sentencing record provides an additional reason to extend deference to the PCR court's ruling. *See Smith*, 140 F.3d at 1271 (stating that when the judge who presided at the post-conviction proceeding also presided at trial and sentencing, the habeas court should consider giving due deference to the state court decision based on the state court's continuing familiarity with the record). In light of the evidence presented in state court, this Court concludes that the state court's decision was not contrary to or an unreasonable application of *Strickland*, nor based on an unreasonable determination of the facts.

1          Third PCR Proceeding

2          During his third round of PCR proceedings, Petitioner re-raised Claim 11(A) in his

3    petition and supported it with additional mitigation evidence, including declarations from

4    family members and a teacher, a 1979 Adobe Mountain Psychological Evaluation, a 1978

5    New Foundation Treatment Summary and Review, a 1977 Camelback Hospital Discharge

6    Summary, childhood medical records, and correspondence from Dr. Potts. (Dkt. 116 at 89-

7    159.)

8          Petitioner alleges that this additional evidence supports his argument that trial

9    counsel's mitigation investigation was deficient and that the failure to present this mitigation

10   evidence prejudiced him at sentencing.  Petitioner contends that the following mitigation

11   allegations should have been presented at sentencing: a genetic predisposition toward

12   addiction and mental illness; fetal alcohol syndrome; alcohol and drug addiction; loss of

13   numerous loved ones; mental illness; psychotic episodes; cultural stigma; lack of positive

14   role models; abject poverty; acute and chronic physical illness; childhood neglect; exposure

15   to neurotoxins; family violence and crime; verbal, physical, and sexual abuse; intellectual

16   impairment; negative affect of environment; institutionalization trauma/racism; and deep

17   religious convictions.  (Dkt. 140 at 67-70.)

18         This Court must evaluate this new mitigation evidence and determine whether trial

19   counsel's mitigation efforts constituted ineffective assistance.   As noted previously,

20   *Strickland* held that "a court need not determine whether counsel's performance was

21   deficient before examining the prejudice suffered by the defendant as a result of the alleged

22   deficiencies."  466 U.S. at 697.  Here, it is appropriate for the Court to first consider the

23   prejudice prong in evaluating Petitioner's additional mitigation allegations and supporting

24   evidence.

25         As previously discussed, Petitioner failed to fully develop the factual basis of Claim

26   11(A) in state court.  He has presented numerous allegations regarding his mental health, but

27   none are supported by the opinion of any mental health expert.  *See supra* note 22.  These

28   unsupported allegations do not constitute substantive mitigating mental health evidence.  *See*

*Wildman*, 261 F.3d at 838-39 (petitioner had the burden to establish what an expert would have testified to and absent such evidence his allegations about expert testimony were speculative and did not establish prejudice).  The allegations that Petitioner is genetically predisposed to addiction, has fetal alcohol syndrome, and was damaged by exposure to neurotoxins require support from a medical practitioner, yet no supporting mental health report was submitted.[23]

Other allegations – that Petitioner was a victim of sexual abuse and that he is a person of deep religious convictions – could have been supported by information from Petitioner himself.  Petitioner has failed to provide such information.  Again, unsupported allegations do not constitute mitigating evidence.  *See Schlang v. Heard*, 691 F.2d 796, 799 (5th Cir. 1982) (mere conclusory statements do not raise a constitutional issue in a habeas case); *cf. Delo v. Lashley*, 507 U.S. 272, 275 (1993) (stating that the Court has never suggested that the Constitution requires a state trial court to instruct the jury on mitigating circumstances in the absence of any supporting evidence).

With respect to the remaining allegations, Petitioner contends that they represent new and additional mitigation evidence, which must be considered by this Court.  These allegations include alcohol and drug addiction, loss of numerous loved ones, mental illness, a psychotic episode, intellectual impairment, cultural stigma, lack of positive role models, abject poverty, acute and chronic physical illness, childhood neglect, family violence and crime, verbal and physical abuse, negative environment, and institutionalization trauma/racism.

Petitioner unfairly discounts the sentencing record when he argues that all of these allegations represent mitigation evidence omitted at sentencing.  When comparing the mitigation evidence presented at sentencing with Petitioner's allegations of new mitigation,

---

[23]    Regarding Petitioner's allegation of fetal alcohol syndrome, even though Petitioner did not present any supporting medical evidence, the Court will consider as mitigating information the fact that Petitioner's mother consumed alcohol during her pregnancy.

it is readily apparent that many of the items Petitioner contends are new were in fact presented at sentencing, including Petitioner's alcohol and drug addiction (ROA 134 at 8-11, 25-27, Tatro report at 4-8, Sentencing letter of Apkaw, Sentencing letter of Rovie), loss of loved ones, lack of positive role models, childhood neglect, verbal and physical abuse, negative effect of environment, and institutionalization trauma/racism (ROA 134 at 25-27, Tatro report at 4-8). Therefore, the Court does not consider these items to constitute new mitigation information. However, Petitioner does submit some new information regarding his mental health and other areas of mitigation. The Court turns to evaluate this evidence.

Mental Health Evidence

As a young child, Petitioner experienced an episode of hysteria when he had to undergo a shot in the neck during a hepatitis outbreak. (Dkt. 116 at 91.) The medical staff had to forcibly bind his arms by wrapping his whole body in a blanket. (*Id.*)

At age twelve, Petitioner was committed to the New Foundation Residential Treatment Center for drug rehabilitation. (ROA 134, Tatro Report at 2.) While at New Foundation, he ingested some jimson weed during a field trip; he became psychotic and was taken to Camelback Hospital. (Dkt. 134, Ex. M.) The report summary indicated that Petitioner was not oriented for time or place or person. (*Id.*) After twelve hours, Petitioner's mental state cleared and he was found to be mentally, neurologically, and physically intact. (*Id.*) He was discharged back to New Foundation one day later. (*Id.*)

During his drug rehabilitation program at New Foundation, counselors apparently submitted periodic treatment summaries to monitor the progress of the residents. (Dkt. 134, Ex. L.) In Petitioner's January 1978 treatment summary, his supervisor noted that, based on the result of a psychological test (Bender Gestalt), Petitioner had a possible cerebral dysfunction. (*Id.*) The supervisor further noted that Petitioner's problem would be thoroughly investigated through his education program. (*Id.*) Other than this one treatment summary, Petitioner has presented no further evidence of possible cerebral dysfunction.

At the age of fifteen, Petitioner was committed to Adobe Mountain School after being charged with trespassing and attempting to enter a residence illegally. (Dkt. 134, Ex. K at

1.)  He was intoxicated at the time of the incident.  (*Id.*)  Upon commitment, he was given a psychological evaluation by Dr. Tatro.  (*Id.*)  In one of the tests administered by Dr. Tatro, the Cattell Test of Intelligence, Petitioner scored on the borderline of intellectual functioning. (*Id.* at 2.)  However, interpreting this result in light of other test results, Dr. Tatro concluded: "In view of his interview behavior and his performance on other tests of personality, which also reflected greater intellectual capacity than is indicated by the Cattell score, I would judge [Petitioner's] intellectual potential to be within the average range."  (*Id.*)

Dr. Tatro evaluated the psychological roots of Petitioner's criminal behavior, which included armed robbery at the age of thirteen and assault and battery at age fourteen.  Based on personality testing, Dr. Tatro indicated that Petitioner's socially maladaptive behavior seemed to have its roots in his family situation, due to the severe rejection he felt from his parents since he was a young child and his anger and frustration at having been cut off from his sources of support and affection.  (*Id.* at 1-3.)

In his report Dr. Tatro also indicated that Petitioner had been placed at the New Foundation residential program in connection with his armed robbery charges.  (*Id.* at 1.) While at New Foundation, Petitioner was described as manipulative, impulsive, easily frustrated and angered, prone to fights, and abusive of the rules forbidding the use of drugs and alcohol.  (*Id.*)  When Petitioner absconded from the program, the staff at New Foundation indicated that they would not consider taking him back.  (*Id.*)

*Discussion*

The Court must assess prejudice based on the totality of the mitigating information. *See Wiggins*, 539 U.S. at 536.  To establish prejudice, the additional mitigation evidence must do more than "barely alter" the sentencing profile already presented to the sentencing judge.  *Strickland*, 466 U.S. at 699-700.

The new mental health mitigation information includes a one-day psychotic episode at the age of fourteen caused by the ingestion of jimson weed.  The Court gives little if any mitigating weight to this incident, which does not appear to have any relevance to Petitioner's mental health at the time of the crime.

1    The new mental health information also includes a treatment summary from a drug

2    and rehabilitation facility indicating that, based on a psychological evaluation, Petitioner may

3    have had a cerebral dysfunction, as well as a psychological assessment discussing the

4    possibility that Petitioner may have borderline intellectual functioning. (Dkt. 134, Ex. K, L.)

5    However, with respect to the former evaluation, it was not followed up with any confirmation

6    that Petitioner suffers from cerebral dysfunction.  Moreover, the latter assessment concluded

7    that Petitioner was of average intelligence.  (*Id.*, Ex. L.)  In addition, while the assessment

8    surmised that Petitioner's maladaptive behavior may be rooted in the rejection he felt from

9    his parents, it included no definitive mental health diagnosis and did not indicate that

10   Petitioner suffered from a major psychological disorder or mental illness.  (*Id.*)

11   Arizona courts have held that, to be entitled to significant mitigating weight, evidence

12   of mental illness must indicate something more than a personality disorder but involve a

13   slow, dull, or brain-damaged defendant whose judgment and rationality were marginal.  *See,*

14   *e.g., Walton v. Arizona*, 159 Ariz. 571, 588, 769 P.2d 1017, 1034 (1989). Petitioner's

15   mitigation evidence does not approach this standard.  Moreover, if Petitioner's Adobe

16   Mountain psychological assessment had been introduced at sentencing, it would have opened

17   the door to information that was harmful to his mitigation case.  For example, submission of

18   the psychological assessment would have enabled the prosecutor to establish that Petitioner

19   admitted committing the armed robbery and that he did so because "I just wanted to show

20   my friends how big and bad I was." (Dkt. 134, Ex. K at 1.)  This crime led to his removal

21   from the family home and placement at New Foundation.  (*Id.*)  Also, the assessment detailed

22   Petitioner's assault and battery of another resident at New Foundation and discussed the fact

23   that Petitioner had absconded from New Foundation and would not be welcomed back to the

24   program.  (*Id.*)  *Cf. Karis v. Calderon*, 283 F.3d 1117, 1136 (9th Cir. 2002) (not IAC for

25   counsel not to introduce childhood abuse evidence through expert testimony because it would

26   have opened the door to damaging rebuttal evidence); *Ainsworth v. Woodford*, 268 F.3d 868,

27   880 (9th Cir. 2001) (Graber, J., dissenting) (much of the evidence upon which the majority

28   relied to find IAC prejudice at sentencing – antisocial personality disorder and history of

drug abuse – presented a double-edged sword, opening the door to harmful rather than helpful inferences).

The additional mental health mitigation evidence offered by Petitioner does not establish that he suffers from any mental illness or disorder.  Therefore, it fails to alter the sentencing profile already presented to the sentencing judge.  *See Strickland*, 466 U.S. at 699-700.  The new information offered in support of Petitioner's IAC claim also contrasts with that in other sentencing-stage IAC cases, where counsel failed to present substantial mental health evidence.  *See, e.g.*, *Stankewitz v. Woodford*, 365 F.3d 706, 718 (9th Cir. 2004) (counsel failed to present mental health mitigation that petitioner had significant brain damage).

### Other Mitigation

Petitioner alleges that counsel should have investigated and presented other areas of mitigation, including cultural stigma, family violence and crime, abject poverty, and acute and chronic physical illnesses.  As with the new mental health information, it is appropriate for the Court first to consider *Strickland*'s prejudice prong in evaluating Petitioner's claim that counsel performed ineffectively by failing to offer additional mitigation evidence.

#### *Cultural Stigma*

Petitioner indicates that his family refused to seek assistance for mental health problems out of fear that their Pima Indian community would shun or ridicule them.  Both Petitioner's mother, Arlene Schurz, and his aunt, Sharon Apkaw, submitted declarations indicating that in their community there was great reluctance to seek help for mental health issues.  (Dkt. 134, Ex. H, I.)  Schurz stated that "[p]eople on the Reservation thought you would have to be crazy to talk to a mental professional about your mental health, and looked down on you, like there must be something really wrong with you."  (*Id.*, Ex. H.)  Apkaw agreed with this characterization, stating that "[i]t is common on the Reservation among the Pima people not to talk about serious problems."  (*Id.*, Ex. I.)

Based on these declarations, Petitioner surmises that some of his relatives may have been suffering from mental health problems but that such problems remained unknown

1    because they did not seek mental health treatment due to cultural stigma.  Whether or not this

2    supposition is accurate, Petitioner has an affirmative burden of proving, through the

3    introduction of relevant mitigating evidence, that he was prejudiced at sentencing.

4    *Strickland*, 466 U.S. at 693.  Relevant evidence would include a history of psychiatric

5    problems within the family.  However, mere allegations that particular family members may

6    have had mental health problems without any supporting evidence is insufficient to establish

7    prejudice.  *See Schlang*, 691 F.2d at 799.

8         *Family Abuse and Violence*

9         Petitioner has presented additional mitigation regarding his dysfunctional family

10   history, which includes allegations that his family had a history of ferocious physical fights,

11   often spurred by alcohol abuse; that his mother was impregnated at age fifteen by her twenty-

12   nine-year-old cousin, Petitioner's father; and that his mother drank alcohol while pregnant

13   with him.

14        In her declaration, Petitioner's mother indicated that when her sister, Eleanor, watched

15   the children, she would hit them and verbally abuse them.  (Dkt. 134, Ex. H.)  Mrs. Schurz

16   acknowledged that she hit Petitioner with a stick at her father's funeral.  (*Id.*)  Sharon Apkaw

17   stated that Petitioner's family experienced alcohol abuse, domestic violence, verbal abuse,

18   infidelity, illness, and poverty.  (*Id.*, Ex. I.)  She further stated that Petitioner was severely

19   abused, both physically and psychologically, throughout his childhood.  (*Id.*)  Petitioner's

20   father, Guy, was a violent man; he beat Petitioner for no reason, sometimes bruising his arms

21   and back.  (*Id.*)  Once he gave Petitioner a black eye and some scrapes on his face.  (*Id.*)

22   Petitioner witnessed his parents' fights, both physical and verbal.  (*Id.*)  Guy had affairs with

23   other women, which caused fights with his wife, Arlene.  (*Id.*)   Arlene got pregnant when

24   she was fifteen and Guy was twenty-nine.  (*Id.*)  When Petitioner's grandfather heard about

25   it, he threatened to file statutory rape charges against Guy.  (*Id.*)  Joycelyn Martinez indicated

26   that Guy punished Petitioner using a belt.  (*Id.*, Ex. J.)  Petitioner would have to wait until

27   Guy was done beating him with the belt before he was allowed to move.  (*Id.*)  Guy would

28   call Petitioner dumb and stupid; he treated Petitioner like an outcast.  (*Id.*)  Guy was also

1  extremely abusive to Petitioner's mother. (*Id.*) He would argue with her, slap her, and knock

2  her down. (*Id.*)

3      These witnesses offered other information about Petitioner's childhood, which the

4  Court must also consider.   Arlene Schurz indicated that her parents were incredibly

5  supportive of Petitioner, including him as they went about their work and looking after him

6  while she was at her place of employment. (*Id.*, Ex. H.) Petitioner's grandmother always

7  protected him and if someone was hurting him, she would make them stop. (*Id.*) Petitioner

8  was proud of all the attention he got from his grandparents. (*Id.*) At teachers' meetings at

9  the elementary school, Mrs. Schurz always had to talk with the teacher about the school

10 performance of her daughters, Leah and Cheryl, rather than Petitioner, because Petitioner was

11 doing fine. (*Id.*)

12      Petitioner's aunt, Sharon Apkaw, also stated that Petitioner's grandparents treated him

13 like the son they never had. (*Id.*, Ex. I.) They were his main source of support and

14 protection until they died. (*Id.*) Petitioner lived with Apkaw for one year in 1985. (*Id.*) She

15 tried to show love and trust to Petitioner. (*Id.*) Petitioner helped around the house with her

16 children, who enjoyed having him around. (*Id.*) Apkaw visited Petitioner and Julie Moore

17 and their child, Marcus. She stated that she could see that Petitioner loved Julie and Marcus

18 very much; they nurtured and cared for each other. (*Id.*)

19      Petitioner's cousin, Joycelyn Martinez, echoed this account of the favorable treatment

20 Petitioner received from his grandparents, stating that she and Petitioner were their

21 grandmother's favorites. (*Id.*, Ex. J.) "We knew that we were the favorites because

22 whenever another family member was coming after us to hit us, my grandmother would stop

23 them." (*Id.* at 1.) Martinez recalled Petitioner living with her family in the 1980s, stating

24 that Petitioner was caring and acted as a peacemaker, keeping the brothers from getting into

25 fights; that he was helpful around the house and helped care for the children; and that he was

26 funny and very loving. (*Id.*)

27      In this Court's evaluation, it is evident Petitioner's home environment was

28 dysfunctional. Growing up, Petitioner had to deal with his family's alcoholism, verbal and

1   physical abuse, which was at times severe, lack of nurturing from his parents, and family

2   fights and violence. However, the majority of the details of Petitioner's dysfunctional family

3   life were discovered and presented to the trial court at sentencing. (ROA 134 and attached

4   psychological report of Dr. Tatro.)  The declarations from Arlene Schurz, Sharon Apkaw,

5   and Joycelyn Martinez highlight the details concerning the turmoil and abuse Petitioner

6   experienced, and the extent to which alcoholism affected all of the adults in his immediate

7   family. (Dkt. 134, Ex. H-J.)  Although the declarations provide additional detail, they do not

8   provide significant mitigating evidence that counsel failed to present at sentencing.  Finally,

9   during his second PCR proceeding, even though Petitioner ultimately did not attempt to

10  prove that he was suffering from fetal alcohol syndrome, he did submit evidence that his

11  mother regularly drank alcohol when she was pregnant with Petitioner.  (*Id.*, Ex. I.)

12        Based upon this record, the Court concludes that this case is unlike other cases where

13  dysfunctional family evidence was not discovered and not presented at sentencing. *See, e.g.*,

14  *Wiggins*, 539 U.S. at 534-36 (counsel's failure to discover and present significant and

15  powerful dysfunctional family history prejudiced him at sentencing); *Williams*, 529 U.S. at

16  396-98 (same); *Frierson v. Woodard*, 463 F.3d 982, 993-94 (9th Cir. 2006) (counsel's failure

17  to discover and present evidence of multiple brain injuries, organic brain dysfunction,

18  learning disability, low intelligence, borderline mental retardation, chronic substance abuse,

19  and an emotional disorder prejudiced him at sentencing).  In Petitioner's case, there is

20  additional evidence of physical abuse which should have been offered at sentencing, but the

21  additional evidence does not alter the basic sentencing profile provided to the sentencing

22  judge. *See Strickland*, 466 U.S. at 699-700.

23        In Arizona, although dysfunctional family evidence is generally afforded some weight

24  as mitigation, it is only entitled to significant mitigating effect when there is a showing that

25  it significantly affected a defendant's ability to perceive, comprehend, or control his actions.

26  *See State v. Hurles*, 185 Ariz. 199, 207, 914 P.2d 1291, 1299 (1996).  If the additional

27  dysfunctional family evidence had been presented, the court would have considered such

28  information, regardless of whether Petitioner could establish a connection between his

dysfunctional family background and his crimes.  *See Tennard v. Dretke*, 542 U.S. 274, 287 (2004); *Newell*, 212 Ariz. at 405, 132 P.3d at 849 ("We do not require a nexus between the mitigating factors and the crime to be established before we consider the mitigation evidence.").  However, although a nexus is not required, the sentencing court is "free to assess how much weight to assign to such evidence."  *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998); *see also Newell*, 212 Ariz. at 405, 133 P.3d at 849 (stating that the failure to establish a causal connection between the mitigating factor and the crime may be considered in assessing the quality and strength of the mitigating evidence).  Furthermore, Arizona holds that adult offenders, as opposed to minors, have a greater degree of personal responsibility for their actions.  *See State v. Gretzler*, 135 Ariz. 42, 58, 659 P.2d 1, 17 (1983).  Petitioner was twenty-six at the time of the murder.

Petitioner has made no showing that his dysfunctional family background had any effect on his ability to perceive, comprehend, or control his actions at the time of the murder.  Rather, Petitioner indicated to Dr. Tatro that he was aware of what he was doing.  (ROA 134, Tatro Report at 2.)   Based on this evidence, the Court concludes that the sentencing court would have assigned minimal significance to the new declarations providing additional detail about Petitioner's dysfunctional family history.

*Poverty*

Petitioner indicates that he was forced to live in squalid conditions during his childhood.  Arlene Schurz attested that Petitioner's family lived in an old military barracks from a World War II Japanese internment camp; the building had no running water, no inside toilet, and only a kerosene heater for the seven or eight people living there.  (Dkt. 134, Ex. H.)  After the barracks, the family moved to a house obtained through the Pima Tribe's self-help housing program.  (*Id.*)  Mrs. Schurz indicated that the family was always very poor; although she worked, she had to feed everyone the cheapest food she could find.  (*Id.*)  Joycelyn Martinez stated that sometimes when his mother was drinking, Petitioner had to make his own meal, something like a bologna sandwich.  (*Id.*, Ex. J.)

This specific information was not presented at sentencing.  The sentencing court was

1    not informed that Petitioner grew up in a Japanese internment barracks or made aware of the

2    full extent of the poverty he experienced during his childhood.  However, as with the

3    dysfunctional family evidence, Petitioner's poverty is not entitled to significant weight as

4    mitigation.  *See State v. Hampton*, 213 Ariz. 167, 186, 140 P.3d 950, 969 (2006)

5    ("Hampton's troubled upbringing is entitled to less weight as a mitigating circumstance

6    because he has not tied it to his murderous behavior" and his age, thirty, lessened the

7    relevance of his difficult childhood).  This Court concludes that the sentencing court would

8    have assigned minimal significance to Petitioner's additional information regarding

9    childhood poverty.

10        *Physical Illnesses*

11        Petitioner indicates that he suffered from a host of illnesses throughout his childhood.

12   Arlene Schurz indicated that when Petitioner was a young boy, his sister contracted hepatitis

13   and the whole family had to be quarantined.  (Dkt. 134, Ex. H.)  During this period,

14   Petitioner had regular contact with medical doctors at the Reservation.  (*Id.*)  Mrs. Schurz

15   otherwise indicated that Petitioner "never really had any health problems."  (*Id.*)  Sharon

16   Apkaw indicated only that Petitioner was overweight as a child.  (*Id.*, Ex. I.)

17        Petitioner also submitted his medical records.  (Dkt. 116, Ex. G.)  They indicate that

18   he suffered from a number of illnesses throughout his childhood, including chronic shizella

19   gastroenteritis, scorpion bites, bloody green stools, anemia, parasitic ringworm, as well as

20   broken bones, amnesia, and head injury.  (*Id.*)

21        As with the other information about Petitioner's difficult childhood and upbringing,

22   the Court does not believe that these reports of childhood illness are entitled to any

23   significant mitigating weight.  *See Hampton*, 213 Ariz. at 186, 140 P.3d at 969.  Certainly

24   Petitioner has not sought to demonstrate that these illnesses had any continuing effect upon

25   his behavior as an adult.  Regarding amnesia and head injury, Petitioner alleges this occurred

26   when he was riding his bike and was hit by a car.  (Dkt. 144 at 54-55.)  The medical records

27   documenting this incident do not discuss any long term effects from Petitioner's injuries.

28   (Dkt. 116, Ex. G at 143.)  Petitioner has not established any prejudice arising from evidence

1    of this incident being omitted at sentencing.

2           Cumulative Evaluation of Additional Mitigation Evidence

3           It remains for the Court to consider cumulatively the mitigation presented at

4    sentencing together with the new evidence presented in Petitioner's PCR proceedings and

5    weigh the totality of the evidence against the evidence submitted in aggravation.  In weighing

6    aggravation and mitigation, Arizona considers the quality and strength, not simply the

7    number, of aggravating and mitigating factors.  *See State v. Greene*, 192 Ariz. 431, 443, 967

8    P.2d 106, 118 (1998).  In aggravation, the Arizona Supreme Court found that the murder was

9    especially cruel, heinous, or depraved within the meaning of A.R.S. § 13-703(F)(6).  The

10   (F)(6) circumstance is intended only for murders that were especially horrific and above the

11   norm of first degree murders.  *State v. Ortiz*, 131 Ariz. 195, 206, 639 P.2d 1020, 1031 (1982).

12   In *State v. Knapp*, 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977), the court discussed the

13   (F)(6) aggravating circumstance in the context of a first degree murder carried out by burning

14   the victims: "We can hardly think of a more ghastly death than this for anyone.  We believe

15   it falls squarely within the meaning of 'heinous, cruel or depraved.'"   In this case, the

16   supreme court provided the following analysis of the especially cruel, heinous, or depraved

17   aggravating circumstance:

18          Schurz does not challenge the trial court's finding that the murder was cruel,
            heinous or depraved. The cold-blooded burning to death of a person who is
19          attempting to flee demonstrates the kind of "vile" mind-set that we have
            labeled heinous or depraved. The suffering – both mental and physical – of a
20          person who remains conscious while receiving third and fourth degree burns
            over almost 100% of his body more than adequately demonstrates cruelty. *See*
21          *State v. Gretzler*, 135 Ariz. 42, 51-52, 659 P.2d 1, 10-11, *cert. denied,* 461
            U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983) (discussing the
22          requirements of the § 13-703(F)(6) aggravating circumstance). We agree with
            the trial court that the evidence proves this aggravating factor beyond a
23          reasonable doubt.

24   *Schurz*, 176 Ariz. at 56, 859 P.2d at 166.

25          In mitigation, counsel first argued that Petitioner's intoxication at the time of the

26   murder constituted a statutory mitigating circumstance under § 13-703(G)(1), which at the

27   time of the offense provided:

28          G.  Mitigating Circumstances shall be any factors proffered by the defendant

> or the state which are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense, including . . . 1.  The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution.

A.R.S. § 13-703(G)(1) (1990).  In support of this factor, counsel argued that Petitioner and his two companions may have had shared as much as two cases of beer, plus some wine, and taken a small amount of heroin on the night of the murder.  (ROA 134 at 8-11.)  Based on this level of alcohol consumption and drug use, counsel argued that intoxication was a major contributing cause of Petitioner's behavior that night.  (*Id.*)  Counsel also presented Dr. Tatro's report, which indicated that Petitioner was quite intoxicated on the night of the murder.  (ROA 134, Ex. A.)  However, based on his interview with and statements made by Petitioner, Dr. Tatro concluded that:

> it does not appear that [Petitioner] was so intoxicated at the time that he did not know what he was doing or that he was unable to appreciate the wrongfulness of his actions. . . .  Based on his description of events, he had a clear understanding that murder was being committed, that such behavior was very wrong in the eyes of the law, and that he and his companions were at risk of grave punitive consequences.  In sum, his defect at the time was not that he did not know what was going on was wrong, but that he did not feel it was wrong.

(*Id.* at 14-15.)  The Arizona Supreme Court considered but rejected Petitioner's intoxication as a statutory mitigating circumstance.  *Schurz*, 176 Ariz. at 56, 859 P.2d at 166.  The court concluded that "we do not find that an uncaring attitude, even though partially caused by drug use, constitutes an impaired ability to 'appreciate' the wrongfulness of one's conduct.  Nor is there evidence that Schurz's intoxication deprived him of his ability to control his conduct."  *Id.*

Counsel also presented information in support of several non-statutory mitigating circumstances.  He offered information that Petitioner suffered from mixed personality disorder with passive-aggressive, avoidant, and antisocial features, coupled with opiate and alcohol dependence and mixed substance abuse.  He noted that Petitioner had a history of contacts with the criminal justice system, some of which resulted in incarceration as a juvenile and as an adult.  Counsel indicated that Petitioner had successfully completed the

1    requirements for a GED certificate and a course of study in a substance abuse treatment

2    program.  Counsel further cited as mitigating circumstances the determination of  co-

3    defendant Allison's guilt by a plea agreement which contained a stipulated sentence of

4    probation with no jail and a dismissal of the murder charge; Petitioner's expression of

5    remorse; and Petitioner's difficult family history.  (ROA 134; *Id.* Ex. A.)

6         During his state PCR proceedings, Petitioner presented some additional mitigating

7    evidence regarding his mental health, but failed to establish that he suffered from any specific

8    mental disease or defect.  This Court finds that this "new" evidence was not significant;

9    rather, it amounted only to additional non-statutory mitigation of *de minimis* weight.  *See*

10   *State v. Johnson*, 212 Ariz. 425, 437, 133 P.3d 735, 747 (2006) (minor mental impairments,

11   such as personality disorders, carry *de minimis* mitigating weight); *cf. State v. Brookover*, 124

12   Ariz. 38, 42, 601 P.2d 1322, 1326 (1979) (major mental impairments, such as brain damage,

13   carry a far greater mitigating effect, especially if the impairment is a major contributing cause

14   to the conduct).  Petitioner also presented additional mitigating evidence regarding his

15   dysfunctional family history and difficult childhood.  As with the  mental health evidence,

16   the Court finds that the new information concerning Petitioner's dysfunctional family and

17   childhood history was largely cumulative and was not significant mitigation evidence.  *See*

18   *Johnson*, 212 Ariz. at 437, 133 P.3d at 747 (dysfunctional family evidence was not

19   significant mitigating evidence because defendant could not establish a causal relationship

20   to the crime).

21        After considering Petitioner's additional mitigating evidence, the Court concludes that

22   such evidence is insufficient to establish that he was prejudiced by counsel's performance

23   at sentencing.  The crime was brutal – the victim was beaten until he retreated and then

24   doused with gasoline and set on fire.  Petitioner presented some additional dysfunctional

25   family evidence and some limited mental health evidence.  However, none of the mental

26   health evidence indicates any serious mental health problems.  Cumulatively, the additional

27   mitigating evidence does not alter the sentencing profile already considered by the sentencing

28   judge.  *See Strickland*, 466 U.S. at 699-700.  Moreover, when the sentencing judge was

1    alerted to some of the additional mitigation evidence during the second PCR proceeding, the

2    court indicated that such evidence was largely cumulative and did not establish either

3    deficient performance or prejudice (ROA 200). *See Smith (Bernard)*, 140 F.3d at 1270.

4    After due consideration, this Court concludes that Petitioner has failed to establish that

5    sentencing counsel's performance was prejudicial; therefore, he is not entitled to relief on

6    Claim 11(A).

7        **Claim 11(C)**

8        Petitioner alleges counsel performed ineffectively by submitting Dr. Tatro's report at

9    sentencing without putting the report into appropriate context, thereby preventing meaningful

10   appellate review.[24]  (Dkt. 140 at 79.)  He further contends that Claim 11(C) should be

11   reviewed on a *de novo* basis.  Respondents argue that Claim 11(C) is subsumed within Claim

12   11(A), which was presented in the second PCR, and that the PCR court's ruling is entitled

13   to deference under 28 U.S.C. § 2254(d)(1).  (Dkt. 141 at 47.)  However, Claim 11(C) was

14   presented for the first time in the third PCR petition; it was not subsumed within Claim

15   11(A).  Because the PCR court did not provide a rationale for its decision, Claim 11(C) will

16   be reviewed *de novo* by this Court.  *See Pirtle*, 313 F.3d at 1167.

17       The heart of Petitioner's claim is the effect of the submission upon the Arizona

18   Supreme Court based on its discussion of Petitioner's non-statutory mitigation, in which the

19   court considered whether such mitigation was sufficiently substantial to warrant leniency.

20   In reference to Dr. Tatro's report, the court indicated:

21       In addition, we do not find, upon review of the record, that the other non-
         statutory mitigating factors found by the trial court are entitled to enough
22       weight to call for leniency in light of the especially cruel or heinous nature of
         this murder. Most of the factors come from Dr. Tatro's report, which paints a
23

24       [24]     In a previous order of the Court, claims similar in substance to 11(C) were
25   found procedurally barred.  Specifically, in its Order of April 11, 2000, the Court found
     barred Petitioner's claims that trial counsel's submission of Dr. Tatro's mitigation report at
26   sentencing was presumptively prejudicial and that trial counsel was ineffective for submitting
     Dr. Tatro's mitigation report at sentencing. (Dkt. 29 at 39-41.) Additionally, in this Court's
27   Order granting amendment of Claim 11(C), the Court noted that these two earlier claims
28   regarding Dr. Tatro's report remained procedurally barred. (Dkt. 133 at 26-27.)

> picture of defendant as a man who, as a result of a less than ideal early family life and almost constant incarceration between the ages of 12 and 20, has developed a volatile and violent personality extremely maladapted to living in society. As tragic as this picture may be, it weighs as much in favor of the death sentence as against it.

*Schurz*, 176 Ariz. at 57, 859 P.2d at 167.  Petitioner contends that by submitting the report, trial counsel turned mitigation evidence into aggravating evidence for the state.  (Dkt. 140 at 78.)

In *Strickland*, the Court specifically warned about second-guessing counsel's performance after an adverse sentence: "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission or counsel was unreasonable."  466 U.S. at 689.  The Court indicated that reviewing courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.*

In this case, trial counsel's submission of Dr. Tatro's report did not prevent meaningful appellate review.  Rather, the Arizona Supreme Court was provided with an opportunity to consider and give effect to all the mitigation evidence presented and determine whether such evidence was sufficient to warrant leniency.  *See Eddings*, 455 U.S. at 112 (Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense).  The court's adverse conclusion at sentencing does not mean that Petitioner was denied meaningful appellate review by counsel's submission of the report.  Rather, counsel presented the mitigation evidence to the court and the court considered it in accordance with the Eighth Amendment.

In the context of a death sentence, meaningful appellate review generally refers to a challenge regarding a state court's appellate review and whether such review is arbitrary and capricious in violation of the Eighth Amendment.  *See Proffitt v. Florida*, 428 U.S. 242, 258-59 (1976) (discussing meaningful appellate review and stating that Florida has undertaken responsibly to perform its function of death sentence review with a maximum of rationality and consistency).  At the time of Petitioner's sentencing, the Arizona Supreme Court

1   independently examined whether a sentence of death had been imposed under the influence

2   of passion, prejudice, or any other arbitrary factors. *See State v. Richmond*, 114 Ariz. 186,

3   196, 560 P.2d 41, 51 (1976). Such independent examination encompassed review of

4   aggravating and mitigating circumstances found by the trial court to ensure that the capital

5   sentence has been properly imposed. *See State v. Brewer*, 170 Ariz. 486, 493-94, 826 P.2d

6   783, 790-91 (1992). Here, the Arizona Supreme Court provided meaningful appellate review

7   by conducting an independent review of Petitioner's death sentence and ensuring that the

8   sentence was not imposed in an arbitrary and capricious manner. *See Schurz*, 176 Ariz. at

9   55-57, 859 P.2d at 165-67. Counsel's submission of Dr. Tatro's report did not prevent

10  meaningful appellate review. Therefore, Petitioner is not entitled to relief on Claim 11(C).

11                                          **CONCLUSION**

12          The Court finds that Petitioner has failed to establish entitlement to habeas relief on

13  any of his claims. The Court further finds, as set forth above, that Petitioner's requests for

14  evidentiary development must be denied.

15          Accordingly,

16          **IT IS HEREBY ORDERED** that Petitioner's Second Amended Petition for Writ of

17  Habeas Corpus (Dkt. 134) is **DENIED WITH PREJUDICE.** The Clerk of Court shall enter

18  judgment accordingly.

19          **IT IS FURTHER ORDERED** that the Clerk of Court send a courtesy copy of this

20  Order to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington,

21  Phoenix, Arizona 85007-3329.

22          DATED this 22nd day of September, 2007.

23

24

25  _____

26                          Earl H. Carroll
                      United States District Judge

27

28